[Crim. No. 34797. Second Dist., Div. Three. Apr. 28, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
LONNIE D. WARDLOW et al., Defendants and Appellants.

COUNSEL

Michael J. Udovic, under appointment by the Court of Appeal, and Charles H. Smith for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney Gener-

al, Paul C. Ament and Mark Alan Hart, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KLEIN, P. J.**—Lonnie D. Wardlow (Wardlow) and Delford George Wilson (Wilson) appeal from their convictions as codefendants following a joint trial (Pen. Code, § 1098) in which two separate juries were simultaneously empaneled in the same courtroom. Wardlow and Wilson each were found guilty of two counts of robbery (Pen. Code, § 211) and one count of murder in the second degree (Pen. Code, § 187). Allegations that Wilson used a gun in the commission of these offenses were found to be true as to all three counts. (Pen. Code, § 12022.5.) Allegations that Wardlow used a firearm in the commission of these offenses were found to be true only as to the two robbery counts. (Pen. Code, § 12022.5.)

## FACTS

On May 16, 1978, Mark Taylor (Mark), Susan McClure (Susan), and Ryan Baker (Ryan) were at the home of Ryan's mother in Huntington Beach. Shortly before midnight, Ryan received a telephone call, following which the three departed for Los Angeles. The trio, driven by Ryan, stopped at a gas station in Los Angeles where they were met by Wardlow, who emerged from the passenger side of a blue van. Having been instructed to follow in their car, Ryan, Susan and Mark did so, eventually arriving at a location near the corner of 52d and Holmes, where the van was parked.

Ryan and Wardlow exited their respective vehicles and engaged in a conversation near the van. Wardlow then entered the grounds of a housing project that was adjacent to the parking lot. When he returned, Wardlow again spoke with Ryan. Thereafter the pair approached the car in which Mark and Susan were still sitting and announced that everyone was invited into one of the apartments. Mark joined Ryan and Wardlow. Susan chose to remain in the car and moved into the driver's seat to await the return of Mark and Ryan. A fourth man, later identified as Wilson, emerged from the driver's side of the van and joined

Mark, Ryan and Wardlow as they walked towards the apartment complex.

Upon reaching a certain apartment in the complex from which loud music was emanating, Wardlow knocked softly on the door. He then turned to Wilson and said, "Let him have it," referring to Ryan. Wilson pulled from his waistband a .38 caliber pistol, handed it to Wardlow, and pulled out a .22 caliber pistol for himself. Ryan and Mark were forced to hand over their wallets. Some threats and a scuffle ensued, during which Mark fled.

Susan had been waiting approximately 10 minutes when Mark came running out of the complex, pursued by Wilson. Susan unlocked the car door after which Mark jumped into the passenger seat and ordered her to drive away. Susan and Mark saw Wardlow and Ryan in a grassy area as they rounded the corner after driving from the parking lot. Mark pulled a sawed-off shotgun out from underneath the passenger seat and fired once into the air and then twice towards Wardlow and Ryan.

Mark and Susan then drove away and, believing Wilson was following them, flagged down a police car which in turn stopped the car following them. That car was in fact driven by a business associate of Wardlow's who was waiting to resume whatever activity he and Wardlow had been engaged in prior to the arrival of Ryan, Mark and Susan. Before submitting to police questioning themselves, Mark and Susan drove around the corner and left the shotgun in an alley, thereafter returning to where the police had stopped the other car.

After piecing together the various accusations made by the two automobile drivers, the police proceeded to the grassy area amidst the housing project. Upon their arrival, the police found Ryan still alive, but critically wounded by two .22 caliber shots and shotgun pellets. He died a short time later as a result of his wounds.

The shouts of a resident of the complex directed police to an apartment where Wardlow was found sprawled on the kitchen floor. He had sustained three wounds from a .38 caliber weapon in addition to injuries from shotgun pellets. Wilson was found crouched near some shelves or furniture in the back of the kitchen. Both guns were also found in the kitchen. Police investigating the scene of the shooting discovered the two wallets taken from Ryan and Mark next to the van.

*Defense*

Both Wardlow and Wilson testified in their own behalf at trial and maintained that they were taking a break from their business of selling meat when they went to meet Ryan at the gas station after midnight on May 17, 1978. They claimed that Ryan and Mark had enlisted their help in locating a quarter pound of PCP and that, upon finding a supplier at the apartment complex, Ryan and Mark had staged a robbery with a .38 caliber weapon. Wardlow and Wilson further asserted that while Ryan and Wardlow struggled over the .38 caliber weapon, Mark ran for the shotgun and Wilson ran for the .22 caliber weapon he kept in the van. Mark left the scene with Susan in the car, rounded the corner and fired the shotgun. Wilson maintains that when he ran back from the van to find Wardlow, he saw Wardlow and Ryan struggling in the grassy area and shot the .22 caliber weapon at Ryan. Wilson then helped the wounded Wardlow into the apartment where both men were subsequently found.

## CONTENTIONS

Wardlow contends that the trial court erred in (1) allowing each defendant to have his guilt or innocence determined by separate juries simultaneously empaneled in the same courtroom and (2) permitting the authentication of autopsy records by someone who did not perform the autopsy or prepare the records.

Wilson urges that the empaneling of two juries violated his Sixth Amendment rights and deprived him of the potentially exonerating testimony of Wardlow.

## DISPOSITION

We find the above contentions to be without merit for the reasons set forth below and therefore affirm the judgments.

## DISCUSSION

█ Both Wardlow and Wilson contend that they were prejudiced by the simultaneous empaneling of two separate juries in the same courtroom. They claim that the trial court exceeded its authority under Penal Code section 1098, that the use of two juries was conducive to juror misconduct, that since the evidence had to be shared it was not

readily available to both panels, that the jurors may have interpreted the wrong evidence, that the jurors' decision was tainted due to the fact that only one jury could sit in the jury box at any given time, that the defendants' right to trial by a 12-member jury had been violated, and that the dual jury procedure created a threat under *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. We disagree.

■ While Penal Code section 1098 requires the joint trial of defendants jointly charged with any public offense, separate trials may be granted at the discretion of the trial court. (*People* v. *Romo* (1975) 47 Cal.App.3d 976, 985 [121 Cal.Rptr. 684], disapproved on other grounds in *People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396]; *People* v. *Isenor* (1971) 17 Cal.App.3d 324, 331 [94 Cal.Rptr. 746].)

"In *People* v. *Massie*, 66 Cal.2d 899 . . ., the California Supreme Court indicated a trial court should consider several criteria in determining whether to grant a severance motion. Such factors and the authorities relied on by the *Massie* court . . . are defined as follows: (1) Where there is an extrajudicial statement made by one defendant which incriminates another defendant and which cannot adequately be edited to excise the portions incriminating the latter (*People* v. *Aranda*, 63 Cal.2d 518, 530-531 . . .; see also *Bruton* v. *United States*, 391 U.S. 123 . . .); (2) where there may be prejudicial association with codefendants (*People* v. *Chambers*, 231 Cal.App.2d 23, 28-29 . . .); (3) where there may be likely confusion from evidence on multiple counts (*People* v. *Chambers, supra*, p. 34); (4) where there may be conflicting defenses (*Day* v. *State*, 196 Md. 384, 391 . . .); and (5) where there is a possibility that in a separate trial the codefendant may give exonerating testimony. (*United States* v. *Echeles* (7th Cir. 1965) 352 F.2d 892, 898.)" (*People* v. *Isenor, supra*, 17 Cal.App.3d at p. 331.)

■ In the instant case, Wardlow and Wilson were charged with identical offenses and alleged identical defenses. The evidence against Wardlow and Wilson was essentially the same. The only dissimilarity was a statement made by Wilson which, as it implicated Wardlow, could have prejudiced Wardlow's case. Thus, in order to afford both Wardlow and Wilson a fair trial while at the same time maintaining judicial economy, the trial court empaneled two juries, one to hear the case against Wilson and the other to hear the case against Wardlow without reference to Wilson's statement implicating Wardlow.

■ "'Trial by jury is an inviolate right and shall be secured to all ....' (Cal. Const., art. I, § 16.) The right is guaranteed as it existed at common law at the time the state Constitution was adopted and may not be abridged by act of the Legislature. (*People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 286-287 ...; *People v. Kelly* (1928) 203 Cal. 128, 133 ....) The Legislature may, however, establish reasonable regulations or conditions on the enjoyment of the right as long as the essential elements of trial by jury are preserved. (*People v. Peete, supra*, 54 Cal.App. 333, 363-364.) Among the essential elements of the right to trial by jury are the requirements that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous. (Cal. Const., art. I, § 16; Code Civ. Proc., § 194; *People v. Superior Court (Thomas), supra*, 67 Cal.2d 929, 932.)" (*People v. Collins* (1976) 17 Cal.3d 687, 692-693 [131 Cal.Rptr. 782, 552 P.2d 742].)

■ The record in the instant case indicates that extreme caution was exercised by the trial court to safeguard the impartiality of both juries during the course of the trial. The two juries were chosen from venires that were mutually exclusive. During the trial, every effort was made to ensure that each jury could view all of the evidence and hear the witnesses. During recesses, after strict admonition not to discuss the cases, the two juries were sent to separate chambers. Each jury heard only the closing argument pertinent to its respective defendant. Each jury was instructed separately. While deliberating, evidence was shared and shuttled between the two juries upon request.

Moreover, the trial court repeatedly emphasized to each jury throughout the trial that it was to consider only the evidence presented as to its respective defendant without being influenced by any argument or rhetoric on the part of counsel. "'In the absence of a strong showing to the contrary, it is presumed that instructions limiting the consideration of evidence to one defendant only sufficiently protects the other defendant's right to a fair trial. [Citation.]'" (*People v. Burns* (1969) 270 Cal.App.2d 238, 253 [75 Cal.Rptr. 688], quoting *People v. Norris* (1963) 223 Cal.App.2d 5, 10 [35 Cal.Rptr. 507]; see also *United States v. Rowan* (6th Cir. 1975) 518 F.2d 685, 689-690.)

In view of the painstaking procedures and safeguards undertaken by the trial court to ensure the impartiality of both juries, we find that no prejudice or unfairness resulted from the empaneling of two juries in the instant case.

Wardlow's contention that the empaneling of two juries violated his rights under *People* v. *Aranda, supra*, 63 Cal.2d 518, is likewise without merit.

■ Under *People* v. *Aranda, supra*, the trial court must give serious consideration to a motion for severance upon defense request where the prosecution seeks to introduce a statement of one defendant which implicates a codefendant. (*People* v. *Aranda, supra*, 63 Cal.2d at pp. 530-531.)

"In *Aranda*, the California Supreme Court sought to accommodate the legislative preference for joint trials (Pen. Code, § 1098) to the fact that the prosecution frequently wishes to present evidence in the form of incriminating statements admissible only against one defendant which, however, incriminate codefendants against whom the statements are inadmissible. The court announced that rather than pursuing the constitutionally doubtful procedure of instructing the jury that such statements can be used only against the declarant defendant, the trial court must delete any portion of the statement 'that could be employed against nondeclarant codefendants'; if effective deletions cannot be made, the trial court must either grant a severance or exclude the statements in their entirety. (*People* v. *Aranda, supra*, 63 Cal.2d at pp. 529-531.)" (*People* v. *Fulks* (1980) 110 Cal.App.3d 609, 616 [168 Cal.Rptr. 203].)

"The principal evidence against defendant *Aranda*, and upon which his conviction was obtained, was the extrajudicial statement of [a] codefendant .... Under circumstances where no clear evidence of joint action, or other evidence under which the conviction could clearly stand, is presented, the court established the procedures to be followed: 'When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. [Fn. omitted.] (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and there-

after offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible.'" (*People* v. *Romo, supra*, 47 Cal.App.3d at pp. 983-984.)

In the case herein, prior to Wilson's testifying in his own behalf, the court held a conference pursuant to Evidence Code section 402 out of the presence of both juries concerning the content of Wilson's statement incriminating Wardlow and the circumstances surrounding it. During trial the officer who took the statement testified before only the Wilson jury. Thereafter, Wilson took the stand before both juries. At the point where the questioning turned to the statement which might have prejudiced Wardlow were it presented to the Wardlow jury, a recess was held. Thereafter, only the Wilson jury remained in the courtroom to hear the portion of Wilson's testimony concerning his statement.

■ The record discloses only one instance where the Wardlow jury was exposed to Wilson's statement. This occurred when Wilson's counsel made a brief reference to certain parts of the statement before both juries in an effort to discredit the method used to elicit the statement. During this questioning, Wilson did not make any representations as to what was contained in the statement, and he merely responded with yes or no answers.

Thus, the portions of the statement which implicated Wardlow were never offered into evidence before the Wardlow jury. We do not find that the mere fact that the Wardlow jury knew that a statement was made by Wilson, without knowing its substance, was sufficient, by itself, to prejudice Wardlow's case.

■ Nor did the empaneling of the two juries violate either Wardlow's or Wilson's Sixth Amendment right to confrontation.

"In *California* v. *Green* (1970) 399 U.S. 149 . . ., the court sets forth the present rule regarding the use of extrajudicial statements as follows: '[T]he Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.' In 1971, the court reaffirmed this doctrine in *Nelson* v. *O'Neil* (1971) 402 U.S. 622 . . . . That case involved a joint trial at which incriminating extrajudicial statements of one codefendant tending to implicate the other were admitted. Both defendants here, however, took the stand and testified. The court, in *O'Neil* at page 627 . . ., stated: 'The Constitution as con-

strued in *Bruton* . . . , is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for "full and effective" cross-examination.' (Italics in original.) In both *Green* and *O'Neil*, both defendants testified as witnesses and were subject to full and effective cross-examination. Thus, no violation of the confrontation clause existed. [¶] In *Bruton* v. *United States, supra,* 391 U.S. 123, the extrajudicial statement of a codefendant was admitted which implicated both the defendant *Bruton* and the codefendant. The court there stated, "'A defendant may be prejudiced by the admission in evidence against a co-defendant of a statement or confession made by that co-defendant. This prejudice cannot be dispelled by cross-examination *if the co-defendant does not take the stand.* [In such a case,] [l]imiting instructions to the jury may not in fact erase the prejudice. . . .'" (Italics added.)" (*People* v. *Romo, supra,* 47 Cal.App.3d at p. 983.)

Due to the use of separate juries in the case herein, the Wardlow jury never heard Wilson's statement incriminating Wardlow. Consequently, Wardlow had no need to confront Wilson regarding the statement. In any event, since both Wardlow and Wilson took the stand, each was free to examine the other as much as he desired.

Wilson's assertion that the use of two juries deprived him of Wardlow's potentially exonerating testimony is also unpersuasive.

■ Wilson claims that had the trials not been severed, Wardlow would have given testimony at Wilson's trial which would have exonerated Wilson. The record discloses that Wardlow did in fact testify at trial before both juries and that his testimony was exculpatory as to both himself and Wilson. As Wilson's counsel was free to question Wardlow, Wilson had ample opportunity to elicit and explore whatever testimony Wardlow had to offer.

■ We now turn to Wardlow's contention that the trial court erred in admitting into evidence the testimony of a deputy coroner's examiner who did not perform the autopsy on Ryan. Wardlow asserts that the credibility, reputation, and capability of the absent examiner who prepared the autopsy report was not sufficiently established and that consequently the admission of the report and the testimony of a substitute examiner as to its contents was error.

One of the duties of the coroner's office is to inquire into and determine the circumstances and causes of violent deaths, after which the

coroner or a deputy must personally sign a death certificate. (Gov. Code, § 27491.) An autopsy report is a public record. (*People v. Williams* (1959) 174 Cal.App.2d 364, 390 [345 P.2d 47]; *Schindler v. Superior Court* (1958) 161 Cal.App.2d 513, 520 [327 P.2d 68], disapproved on other grounds in *People v. Garner* (1961) 57 Cal.2d 135, 142 [18 Cal.Rptr. 40, 367 P.2d 680].) As such it may be admitted into evidence if it was made by and within the scope of duty of a public employee at or near the time of the act, condition, or event and if the sources of information and the method and time of preparation were such as to indicate its trustworthiness. (Evid. Code, § 1280.) "Evidence Code section 1280 permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness. [Citation.]" (*People v. York* (1980) 108 Cal.App.3d 779, 790-791 [166 Cal.Rptr. 717]; *People v. Abelson* (1980) 104 Cal.App.3d Supp. 16, 19-20 [164 Cal.Rptr. 369].)

The examiner who performed the autopsy on Ryan had left the employ of the coroner's office at the time of trial. The prosecution felt that the autopsy report could stand on its own and therefore made no effort to serve the absent deputy examiner. Instead, an examiner then employed by the coroner's office was called to testify concerning his own medical conclusions as to the cause of death based upon the autopsy report prepared by his former associate. The examiner also testified as to his knowledge of the entrance requirements and hiring policies followed by the coroner's office. This testimony indicated that the coroner's office did indeed require that its examiners graduate from accredited medical schools.

On similar facts in *People v. Demes* (1963) 220 Cal.App.2d 423 [33 Cal.Rptr. 896], the court allowed an associate of the examining deputy to read the findings of the autopsy report into evidence, holding that the report constituted prima facie evidence of the facts stated therein. (*Id.* at p. 442.)

Thus, in view of the trial court's extensive inquiry into the autopsy report before ruling the deputy coroner's testimony admissible, and the foundation laid as to the hiring practices of the coroner's office in existence at the time both deputy examiners were hired, admission of the deputy coroner's testimony was not error and certainly not prejudicial

error. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243]; *People* v. *Betts* (1980) 110 Cal.App.3d 225, 231 [167 Cal.Rptr. 768]; *People* v. *Clark* (1980) 109 Cal.App.3d 88, 90 [167 Cal.Rptr. 51].)

The judgments are affirmed.

Cobey, J., and Potter, J., concurred.

The petition of appellant Wardlow for a hearing by the Supreme Court was denied June 24, 1981.