THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICARDO B. and EDWARD AHRENS, Appellants.

Second Department, August 24, 1987

**APPEARANCES OF COUNSEL**

*Schwartz & DiBlasi (Barry A. Schwartz* of counsel), for Ricardo B., appellant.

*Sutter, Balkin, Marten & Regan (Ruth C. Balkin* and *John Joseph Sutter* on the brief), for Edward Ahrens, appellant.

*Denis Dillon, District Attorney (Anthony J. Girese* and *Bruce E. Whitney* of counsel), for respondent.

### OPINION OF THE COURT

Brown, J.

Among the issues confronting us on this appeal is whether the County Court erred in impaneling multiple juries to separately determine the guilt or innocence of two jointly tried defendants.

Shortly after 11:00 P.M. on January 31, 1983, Troadio Martinez, a retired New York City police officer and his teen-age son, Martin, were stopped in their car at the intersection of Hempstead Turnpike and Silver Lane in Levittown. Facing north on Silver Lane, they waited for the light to change as a woman in a gold or brown Chevrolet Nova began to turn left from the westbound turning lane of Hempstead Turnpike across the eastbound lanes thereof into Silver Lane. As Martinez and his son observed the Nova's driver turn at a slow speed and look to her right, they heard the loud roar of car engines from somewhere to their left. As they turned toward

the sound, they saw two cars rapidly approaching in the eastbound lanes of the Turnpike, traveling at the same speed abreast of each other. The two cars appeared to collide with the Nova at the same time, causing a loud explosion, a shower of sparks and clouds of black smoke. The car in the eastbound center lane (closest to the witnesses), a blue Pontiac Trans Am, separated from the collision, skidded to the south curb and flipped over. The car in the eastbound left lane, a red Camaro, dragged the Nova further east down Hempstead Turnpike until they both came to a stop near the south curb. The driver of the Nova, 35-year-old Mildred Carman, died instantly from skull fractures and intracranial hemorrhage. The defendant, Edward Ahrens, the driver of the blue Trans Am, was removed unconscious from his car with trauma injuries and taken to the hospital where he regained consciousness three days later and remained hospitalized another week for treatment. The defendant, Ricardo B., driver of the Camaro, and his passenger, Edgar Barrero, sustained only minor cuts.

Neighbors and bystanders gathered at the scene of the collision and, according to the teen-age eyewitness, Martin Martinez, the witness mentioned to someone in the crowd that the cars were drag racing before the impact, at which point, he testified, the defendant Ricardo B. told him not to tell the police that they were drag racing; "tell them we were only doing 55 or we'll get in trouble". In a statement the defendant Ricardo B. later gave to a police detective, he claimed that he had been driving between 40 and 42 miles per hour (the speed limit on Hempstead Turnpike is 40 miles per hour) and that the Nova turned right in front of him.

The defendants were indicted and charged with manslaughter in the second degree (Penal Law § 125.15 [1]) and criminally negligent homicide (Penal Law § 125.10) on alternative theories of individual and accomplice liability. Since the People indicated that they intended to introduce at trial the defendant Ricardo B.'s inculpatory statement made at the scene to the eyewitness, the defendant Ahrens moved for a severance of his case and a separate trial from that of his codefendant pursuant to CPL 200.40 (1) and *Bruton v United States* (391 US 123). The People opposed the application and requested instead that the case be tried before two juries, one for each defendant. Over the objections of both defendants, the trial court granted the People's motion and impaneled two juries. The members of each jury were given labels to wear

designating which defendant's fate they were considering. They were instructed by the trial court not to communicate with the members of the other defendant's jury, and not to speculate about the reason for the presence in the courtroom at times of only one of the two juries. Opening statements were made to each jury separately and then both juries were brought into the courtroom to hear the testimony. During the introduction of Ricardo B.'s inculpatory statements, only his jury remained in the courtroom while the Ahrens jury was excluded. Separate summations were delivered to each jury and, without objection, the court gave one charge to both juries, omitting any mention of the inculpatory statements.

The People's case rested primarily on the testimony of the eyewitnesses and on testimony from three accident reconstruction experts. These experts examined the scene and the damaged cars, took photographs and made measurements, and in one case, utilized a computer program to calculate the speed and direction of the cars prior to impact and the sequence in which the impact occurred. Their estimates of the preimpact speed of the Trans Am and Camaro ranged from 70 to 90 miles per hour, while the Nova's speed was estimated at 15 to 20 miles per hour as it made its turn. These experts agreed that the Trans Am hit the Nova first, impacting the Nova's right front, and a split second later, the Camaro hit the Nova's right rear. There were no skid marks on the road, indicating little or no braking prior to impact. Based on their calculations and observations, it was the opinion of the People's experts that if the eastbound cars had been traveling at 40 to 50 miles per hour, they would have passed behind the Nova and the collision would not have occurred.

The autopsy on the victim disclosed that she had .12 of 1% of alcohol in her brain, indicating legal intoxication (Vehicle and Traffic Law § 1192 [2]). Although none of the accident reconstruction experts called by either side considered the victim's intoxication to have been a cause of the collision, the defense gave it great weight and sought to persuade the two juries that the victim was a drunk driver who had failed to yield the right-of-way to the oncoming eastbound cars and had therefore brought about her own death.

Both defendants testified. Each denied that they were known to one another prior to the accident. Each, however, admitted that he had noticed the other car and driver as they were stopped side by side at a stoplight .4 of a mile west of the accident site. Each denied exchanging any words or signals

with the other. Ricardo B. testified that he proceeded first when the light changed and accelerated to "a little over 40, tops" when suddenly a car turned directly in front of him. He stated that he braked and turned his wheel to the left but that it was too late to avoid the collision and his Camaro hit the right rear of the Nova, rotating the Nova in a clockwise direction into the path of the Trans Am. Ricardo B. said that he felt a second impact as though he "got hit again".

Ahrens agreed that Ricardo B.'s Camaro left the stoplight first, but Ahrens claimed that he had been tuning his radio and not paying any attention to that car. He said that as he drove towards Silver Lane, the Camaro was 3 to 4 car lengths ahead of him; that he did not know the speed limit and had accelerated his Trans Am to between 50 and 55 miles per hour. Suddenly, he testified, a car about 10 to 15 feet ahead of him cut across the eastbound lanes and was hit by the Camaro, rotating it into the path of his car. Ahrens did not remember whether or not he had braked his car, and said that he had lost consciousness at impact. Both defendants denied roaring their engines or participating in a drag race.

Each defendant presented his own accident reconstruction expert. The opinions of these two experts, although differing in some details, essentially corroborated the defendants' testimony about how the collision happened. Based on their investigations, measurements and calculations, the defendants' experts estimated the Camaro's preimpact speed at 35 to 40 miles per hour. Ahrens' expert estimated the preimpact speed of his car at 60 miles per hour.

■ Contrary to the defendants' contentions on appeal, we find that the evidence, viewed in the light most favorable to the People (see, People v Malizia, 62 NY2d 755, cert denied 469 US 932), was legally sufficient to support the verdicts of both juries finding them guilty of criminally negligent homicide. Furthermore, upon the exercise of our factual review power, we are satisfied that the evidence established the guilt of both defendants beyond a reasonable doubt and that the verdicts are not against the weight of the evidence (see, CPL 470.15 [5]). The evidence in this case of excessive speed coupled with the circumstances under which the incident occurred, at night on a well-traveled highway where traffic is restricted to a moderate speed, the two cars speeding side by side and hitting a turning vehicle without any braking or evasive action, sufficed to sustain the People's burden of proof.

We similarly reject the defendants' contention that the element of causation was not established. The court's charge correctly informed the juries that if they found that the victim's conduct was the sole cause of her own death, they must acquit, but further, that if they found that the People had proved beyond a reasonable doubt the elements of criminally negligent homicide including "that the defendant's [sic] conduct was a sufficiently direct cause of Mildred Carman's death", they could find the defendants guilty "even though Mildred Carman may have contributed to her own death" *(see, People v Stewart,* 40 NY2d 692, 696-697; *People v Kibbe,* 35 NY2d 407, *rearg denied sub nom. People v Krall,* 37 NY2d 741). The obvious conclusion of both juries, hearing virtually the same evidence, that each defendant's conduct was a "sufficiently direct cause" of the victim's death despite her intoxicated condition is eminently rational and supported by the People's proof. The resolution of the conflict between the defendants' testimony, as supported by their experts, that they were not racing, and the People's proof to the contrary, was within the juries' proper function *(People v Herriot,* 110 AD2d 851).

We next turn to the defendants' claim that the judgments appealed from must be reversed on the ground that the procedure of impaneling multiple juries rather than granting a severance where there is a *Bruton* problem is unauthorized by the Criminal Procedure Law. Moreover, they argue that, in their case, the procedure was highly prejudicial and deprived them of a fair trial. The defendant Ahrens, who had sought a severance at the outset of the trial, also contends that his defense was prejudiced by the exclusion of his jury when certain testimony was taken relating to statements made by his codefendant, Ricardo B. Specifically, he argues that his jury should have been present to hear certain defense witnesses testify that Ricardo B. had told them at the accident scene that the deceased had cut in front of him.

Concededly, there is no statutory authority or precedent in this State for the use of multiple trial juries. CPL 200.40 provides for a joint trial or separate trials in cases charging multiple defendants; it provides for no other alternative. Although the use of two juries as an innovative and economical alternative to severance has been upheld in other jurisdictions in the absence of demonstrated prejudice, the procedure has not been generally endorsed or encouraged, particularly by State courts *(see, e.g., State v Corsi,* 86 NJ 172, 430 A2d

210; *Scarborough v State,* 50 Md App 276, 437 A2d 672; *State v Lambright,* 138 Ariz 63, 673 P2d 1, *cert denied* 469 US 892). The Supreme Court of New Jersey has warned that "the multiple jury procedure * * * can involve substantial risks of prejudice to a defendant's right to a fair trial" and that "there are too many opportunities for reversible error to take place. We do not recommend it" *(State v Corsi,* 86 NJ 172, 178, 430 A2d 210, 213, *supra).* Although the procedure is viewed more favorably by the Federal courts, which are empowered by Federal Rules of Criminal Procedure, rule 57 (b) to "proceed in any lawful manner not inconsistent with these rules or with any applicable statute", they hold that there must be no infringement upon due process in its use, or prejudice to a defendant's defense at trial *(see, e.g., United States v Lewis,* 716 F2d 16, 19, *cert denied sub nom. Motlagh v United States,* 464 US 996; *see also, United States v Sidman,* 470 F2d 1158, *cert denied* 409 US 1127). We note that no court, State or Federal, has held the procedure to be inherently prejudicial, nor has any court to date found specific prejudice warranting reversal in the matter before it.

In this case, the dual jury procedure was carefully planned and fully explained to the juries, the defendants and their counsel. The plan was strictly adhered to, and no problems arose during the trial. Despite the assertion on appeal that the simultaneous charge to both juries here was prejudicial and confusing, there was no objection from either defendant on that basis prior to deliberations and any error in that respect is therefore unpreserved for our review (CPL 470.05 [2]). In any event, in this case we find neither error nor prejudice in the simultaneous charge *(see generally, Richardson v Marsh,* 481 US —, 107 S Ct 1702). As to Ahrens' claims of prejudice to his defense, his jury heard Ricardo B. in his testimony say that he had told his father that night that the deceased cut in front of him, and the repetition of that self-serving statement by other witnesses would have constituted inadmissible hearsay which the court properly could have excluded Ricardo B.'s jury from hearing. Ahrens' other claims of prejudice have no merit.

Although we find that the use of the multiple jury procedure did not result in prejudice to the defendants in the instant case, we share the concern of the courts in our sister States that the use of the multiple jury procedure should be utilized only after careful consideration of all pertinent factors and when there are substantial benefits in so doing and no

jeopardy to the rights of the defendants. The procedure should only be used in the extraordinary case where it is clearly warranted by the existence of such factors as the probability of successive protracted trials involving several defendants, prejudice to the prosecution by reason of an inability to repeatedly produce complaining and other witnesses at separate trials, substantial delay affecting the defendants' right to a speedy trial, or significant negative impact upon the available resources of the criminal justice system. And, of course, in the rare case in which the multiple jury procedure might be appropriate, care must always be taken by the trial court to insure that the due process rights of the defendants are not intruded upon.

Finally, despite the absence of a prior criminal record on the part of either defendant, their criminal conduct which caused the death of a young mother justified the trial court's imposition of a short period of six months' incarceration in addition to probationary supervision and community service for each. Under the circumstances, we do not find the sentences excessive and decline to disturb them *(see, People v Suitte,* 90 AD2d 80).

MOLLEN, P. J., RUBIN and KUNZEMAN, JJ., concur.

Ordered that the judgments are affirmed, and the matters are remitted to the County Court, Nassau County, for further proceedings pursuant to CPL 460.50 (5).