JOSEPH ANTHONY EWISH AND TIMOTHY EDWARD WEBB, APPELLANTS, v. THE STATE OF NEVADA, RESPONDENT.

No. 23153

March 30, 1994                                        871 P.2d 306

*Laura W. FitzSimmons,* Las Vegas, for Appellant Ewish.

*Mace J. Yampolsky,* Las Vegas, for Appellant Webb.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *Melanie Andress,* Deputy District Attorney, Clark County, for Respondent.

# OPINION

By the Court, YOUNG, J.:

## FACTS

At approximately 4:30 a.m. on March 3, 1990, appellants Joseph Anthony Ewish ("Ewish") and Timothy Edward Webb ("Webb"), accompanied by Mitchell Nelson ("Nelson"), threw a Molotov cocktail into the home of Eppie Lopez ("Lopez") in Las Vegas. The resulting fire killed Lopez and his father. Six other persons were in the house at the time of the fire.

After leaving the Lopez residence, all three men drove to Ricky Newton's home in Las Vegas and threw another Molotov cocktail through a bedroom window. A corresponding fire erupted at approximately 4:53 a.m. and was extinguished. No injuries resulted. Three people were in the Newton home at the time of the fire.

The firebombing of the Lopez household was the result of a dispute over marijuana. On an earlier date, Webb was intoxicated and drove Ewish's car into the lube pit of a Las Vegas service station. The station workers summoned the police. Fearful of police involvement, Webb entrusted his friend Lopez with a quarter pound of marijuana resting in the trunk of Ewish's car. Lopez climbed the wall of the service station, with marijuana in hand, and escaped police detection. Later, both Webb and Ewish confronted Lopez about the contraband's whereabouts. Lopez claimed he lost the marijuana during the confusion of his escape. Disbelieving their friend, Webb and Ewish threw a Molotov cocktail into Lopez's house.

With respect to the firebombing of Ricky Newton's household, the motive is not as clear. Apparently, a feud broke out between two factions of friends, with Ricky Newton being at odds with Nelson, Webb, and Ewish. Disparaging comments were made about someone's girlfriend. The dispute escalated into a scheduled street fight which took place at a Las Vegas junior high school in February 1990. This fight erupted into many tangential scufflings, and, in the middle of these events, Ewish pointed a rifle at Newton's van and threatened to "shoot it up." Webb was in Ewish's car at this time. This exchange was apparently the precursor to the Newton firebombing.

Ewish, Webb, and Nelson were all charged with two counts of arson, two counts of murder with a deadly weapon, and nine counts of attempted murder with a deadly weapon (the nine

counts equalling the number of uninjured people occupying the Lopez and Newton households). The district court refused to try the three defendants separately, wanting to retain the administrative advantages of a joint trial. Yet to protect against the somewhat antagonistic trial defenses of the defendants, the court opted to utilize a multiple jury system. In accordance therewith, three juries were empaneled and assigned to an individual defendant. Common evidence was presented to all three juries. Yet when the court felt that justice or procedure required it, the juries were separated and individually considered evidence particular to their defendant's trial.

At trial, the State provided overwhelming evidence establishing Webb's direct involvement in both crimes. In fact, Webb himself took the stand and admitted that he threw the Newton firebomb. He also admitted being present at the Lopez bombing. In addition, there was testimony establishing that Webb wanted to get even with Lopez and even boasted about his participation in starting the fires.

Webb's sole defense at trial was that he was too intoxicated to form the specific intent necessary to commit arson or murder. Webb testified that he had been drinking heavily and smoking "primos" (cocaine mixed with marijuana) for two days prior to the firebombings. Webb claimed that he was passed out in the back seat of Ewish's car during the Lopez firebombing and had no recollection of those surrounding events. He allegedly regained consciousness sometime thereafter, immediately before throwing the Molotov cocktail into the Newton home. Webb maintained that he was in a "cocaine coma" and his only recollection was being handed the firebomb and throwing it through a bedroom window.

This aspect of Webb's testimony was corroborated to a limited degree. His counsel presented expert testimony characterizing Webb as a "chronic alcoholic" who could have been experiencing an intoxication blackout during the crimes. There was also testimony that one of the three defendants was passed out during some of the night's events.

Although Ewish did not testify in his own behalf, he presented a similar defense at trial. In essence, Ewish claimed that due to his mental impairment, meek personality, and intoxication on the night of the crimes, he could not have formed the specific intent necessary to aid in and abet murder or arson. Ewish presented both expert and lay witness testimony in an attempt to support this theory. These witnesses testified that Ewish had a mental age of thirteen, a sixth grade reading level, was susceptible to control of others, and had other related mental deficiencies.

The State refuted these claims by providing overwhelming

evidence establishing Ewish's direct and active participation in both firebombings. It was established that Ewish was present during both criminal events, had a motive for the Lopez fire-bombing, acted as a lookout, and later boasted about his involvement in the crimes. In addition, the State presented evidence that Ewish was holding down a job, could write and spell with accuracy, had served in the military, and had no mental deficiencies prohibiting him from acting willfully and with deliberation.

After considering the evidence, each of the three juries returned individual verdicts. Ewish was convicted of two counts of murder while using a deadly weapon, two counts of arson, and nine counts of attempted murder.[1] Webb was convicted of two counts of arson and two counts of murder while using a deadly weapon, but was acquitted of the attempted murder charges. Nelson was acquitted of all charges and is not a party to this appeal.

Webb and Ewish each received two life sentences with the possibility of parole for the first degree murder convictions. These sentences were enhanced with two consecutive terms of life for using a deadly weapon. Additionally, each received two twelve-year prison sentences for their respective arson convictions.

As a result of the multiple jury process, the trial lasted four weeks and fostered a variety of issues for appeal. Webb and Ewish capitalize on this fact and each presents a derivation of the following arguments on appeal: (1) the district court improperly denied a requested jury instruction describing a lesser related offense to arson; (2) the district judge lacked the authority to empanel multiple juries; (3) the multiple jury process resulted in undue reversible prejudice; and (4) there was insufficient evidence to support their respective convictions.

Separately, Ewish makes two additional arguments. First, he claims that the district court improperly instructed the jury regarding use of a deadly weapon, and thus, his sentence was erroneously enhanced. Second, Ewish claims that the State's indictment allegations did not match its aiding and abetting theory of conviction at trial.

We disagree with all Ewish's arguments and accordingly affirm his convictions and corresponding sentences. Similarly, we disagree with all Webb's arguments related to the Lopez firebombing and affirm his corresponding arson and murder convictions. However, we conclude that the trial court erred by rejecting a

---

[1]Ewish successfully moved for a new trial on the attempted murder convictions. However, the State opted not to pursue a new trial on those charges.

proposed jury instruction with respect to Webb's involvement in the Newton fire. Therefore, we reverse Webb's arson conviction stemming from his involvement in that crime.

## DISCUSSION

### I. *Lesser related instruction*

At the close of evidence, Webb and Ewish introduced a jury instruction describing malicious destruction of property using an explosive device, codified in NRS 202.830 (hereinafter "explosive destruction").[2] The proposed instruction mirrored the elements appearing in the statute. Webb and Ewish argued that explosive destruction was a lesser related crime to arson, and thus, they were entitled to the instruction being presented to the jury. The district court held otherwise, and appellants renew their contentions on appeal.

The trial court must instruct the jury on a lesser related offense when three factors are established: (1) the lesser offense must be closely related to the offense charged; (2) the defendant's trial defense must be consistent with the lesser related offense; and (3) evidence must reasonably support guilt for the lesser related crime. *Stanifer v. State,* 109 Nev. 304, 849 P.2d 282 (1993); *Moore v. State,* 105 Nev. 378, 776 P.2d 1235 (1989). This court adopted the lesser related instruction requirement in *Moore,* and an examination of the facts therein illustrates application of these three factors.

In *Moore,* several persons were charged with the beating and murder of a woman at a Reno apartment complex. Codefendant Mayfield presented evidence that he had arrived at the scene after the fatal blow was struck and had merely dragged the dead body behind a fence. Mayfield appealed his murder conviction, arguing that the district court improperly rejected a jury instruction describing accessory after the fact. *Moore,* 105 Nev. at 379-80, 776 P.2d at 1237.

This court reversed Mayfield's conviction. First, accessory after the fact was a lesser related offense to murder. Second,

---

[2]In pertinent part, NRS 202.830 reads as follows:

Any person who maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle or real property in the state:

1. If no substantial bodily harm results, shall be punished by imprisonment in the state prison for not less than 2 years nor more than 10 years . . . .

2. If substantial bodily harm results, shall be punished by imprisonment in the state prison for not less than 2 years nor more than 20 years . . . .

Mayfield's defense was consistent throughout trial that he did not participate in the beatings and was only an accessory after the victim was killed. Finally, evidence existed supporting Mayfield's guilt for the lesser related offense. There was testimony that Mayfield arrived at the scene more than five minutes after the beatings took place. This testimony, coupled with medical evidence, established that Mayfield had in fact arrived after the victim had died. *Id.* at 384, 776 P.2d at 1239.

### A. *Ewish's convictions and Webb's convictions for the Lopez firebombing*

In the instant case, application of *Moore* indicates that the district court properly rejected the lesser related instruction with respect to all Ewish's charges and Webb's charges solely related to the Lopez firebombing. In short, all three *Moore* factors are not satisfied.

Applying the first factor, we conclude that explosive destruction is a lesser related offense to arson.[3] Nevada's arson statute, NRS 205.010, prohibits the willful and malicious burning of a dwelling. Similarly, explosive destruction, NRS 202.830, prohibits the malicious destruction of real property using and explosive. NRS 202.750 defines explosive as any "incendiary devices . . . that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture or device or any part thereof may cause an explosion." Throwing a Molotov cocktail into a house and causing a fire is prohibited conduct under both statutes.

By contrast, the second and third *Moore* factors are not satisfied. Webb's defense to the Lopez firebombing and Ewish's overall defense are wholly inconsistent with the lesser related crime. Webb denied any participation in the Lopez incident, claiming that he was passed out in the back seat of Ewish's car. Similarly, Ewish defended against the State's aiding and abetting charges by flatly denying any active participation in either crime. Ewish also claimed that he was mentally incapable of forming the

---

[3]Contrary to the State's contentions, explosive destruction is a lesser crime than arson simply because one convicted thereunder cannot apparently be convicted of felony murder. Nevada's felony murder rule codified in NRS 200.030(1)(b) does not list explosive destruction as a felony subject to application of the statute. Arson is a listed offense. While we do not conclude that this list is exhaustive, we merely reference this point to illustrate that explosive destruction is a lesser related crime than arson.

Moreover, an explosive destruction conviction only carries a maximum penalty of ten years in prison where no substantial bodily harm results. First degree arson carries a maximum penalty of fifteen years.

specific intent to aid in or abet any criminal activity. If believed, Webb's and Ewish's respective defenses would refute murder, arson, and even explosive destruction. The lesser related instruction is simply not required where a defendant completely denies culpability and is either guilty of the charged crime or not guilty at all. *See, e.g.,* State v. Williams, 698 P.2d 724, 731 (Ariz. 1985); People v. Geiger, 199 Cal.Rptr. 45, 58 (Ct.App. 1984).

In addition, there is no evidence in the record rationally supporting a conviction for the lesser related offense. Although Webb and Ewish presented evidence that they were not guilty of arson or aiding and abetting, this did not support an explosive destruction conviction. For example, all the evidence introduced in Webb's defense, if anything, established that he was passed out in the back seat of Ewish's car while Lopez's house was firebombed. From this posture, Webb could not have committed any crime. In turn, Ewish presented evidence refuting any active complicity in the night's events. If accepted, this evidence provided Ewish with a defense to any criminal activity.

In view of this rationale, we conclude that the district court did not err by refusing to issue the lesser related instruction. This conclusion applies to all Ewish's convictions and Webb's convictions stemming from the Lopez firebombing.

## B. *Webb's arson conviction for the Newton firebombing*

Conversely, this same conclusion does not apply with respect to Webb's convictions for the Newton fire. After analysis under *Moore,* we conclude that Webb was entitled to the lesser related instruction.

Webb's trial defense to the Newton firebombing was consistent with explosive destruction. He took the stand and admitted committing a culpable act by throwing the Molotov cocktail at Newton's home. Webb then claimed that due to his voluntary intoxication, he could not have formed the requisite specific intent necessary to commit arson. This was a viable defense to a specific intent crime, and the jury was instructed accordingly. If believed, the only crime Webb could have committed was explosive destruction, a general intent offense.[4] *See Geiger,* 199

---

[4] NRS 202.830 defines malicious destruction in general intent terms, describing one who "*maliciously* damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle or real property . . . ." (Emphasis added.)

In addition, the general provisions chapter of Nevada's criminal code, NRS 193.0175, defines "maliciously" as follows:

Cal.Rptr. at 47 (lacking specific intent to commit robbery was consistent with lesser related general intent offense of vandalism, thus requiring vandalism instruction). Moreover, the trial evidence reasonably supported Webb's guilt for the lesser related crime. There was testimony that Webb had been drinking and smoking cocaine and marijuana for several hours prior to the firebombing. Expert testimony also characterized Webb as a chronic alcoholic who may have been suffering from an intoxication blackout.

For the reasons noted above, we conclude that Webb was entitled to the lesser related instruction. Rejecting such an instruction was an abuse of the trial court's discretion, warranting the reversal of Webb's arson conviction for the Newton firebombing.

## II.  *Use of the multiple jury system*

The utilization of the multiple jury process is an issue of first impression in this court. Therefore, a brief discussion regarding the device's history and current status in other jurisdictions is appropriate.

The multiple jury procedure is a fairly recent development in this country. It was designed to combat the problem where a codefendant's out-of-court admission was introduced at trial and implicated the accused. David Carl Minneman, Annotation, *Joint Trial—Multiple Juries,* 41 A.L.R. 4th 1189 (1985). This dilemma was first described in Bruton v. United States, 391 U.S. 123 (1968), where the Supreme Court held that the accused's right to confrontation under the Sixth Amendment was violated by admitting such a statement at a joint trial. By empaneling multiple juries, codefendants can still be tried together and the court can screen one jury from hearing the out-of-court admission by simply removing the affected jury from the courtroom.

Due to apparent popularity, however, the device has developed

---

"Malice" and "maliciously" import an evil intent, wish or design to vex, annoy or injure another person. *Malice may be inferred from an act done in willful disregard of the rights of another, or an act wrongfully done without just cause or excuse, or an act or omission of duty betraying a willful disregard of social duty.*

(Emphasis added.)

Although this definition does refer to intentional conduct, it also includes conduct betraying a social duty. Yet whatever this latter language means, the important fact is that "maliciously" is not consumed by intentional conduct. Thus, the crime malicious destruction does not require the specific intent to commit some further act, beyond the prohibited conduct itself. State v. Cantrell, 673 P.2d 1147 (Kan. 1983), *cert. denied,* 469 U.S. 817 (1984); Jennings v. State, 806 P.2d 1299, 1303 (Wyo. 1991) (articulating general definition of specific intent).

in areas outside the *Bruton*-type dilemma. For example, the ABA Standards for Criminal Justice advocate using multiple juries where general problems of prejudicial evidence may present themselves in joint trials. ABA Standards for Criminal Justice, § 13-3.2, commentary at 13-36 (2d ed. 1980). Moreover, several reported decisions reference the ability to conserve judicial resources by empaneling more than one jury in a single proceeding. *See, e.g.,* United States v. Hayes, 676 F.2d 1359, 1367 (11th Cir.), *cert. denied,* 459 U.S. 1040 (1982); Hedlund v. Sheldon, 840 P.2d 1008, 1011 (Ariz. 1992); State v. Beam, 710 P.2d 526, 533-34 (Idaho 1985), *cert. denied,* 476 U.S. 1153 (1986).

The multiple jury procedure has received both praise and criticism in recent appellate court decisions scattered throughout the country. Some courts view the process as an attractive way of preserving the joint trial method of prosecution by eliminating the impact of codefendants' antagonistic defenses. *See, e.g.,* United States v. Lebron-Gonzales, 816 F.2d 823, 830-31 (1st Cir.), *cert. denied,* 484 U.S. 843 (1987); People v. Wardlow, 173 Cal.Rptr. 500 (Ct.App. 1981); Feeney v. State, 359 So.2d 569 (Fla.Dist. Ct.App. 1978). Other courts characterize the procedure as ladened with administration difficulties and an aggravator of what it was designed to eliminate—unfair prejudice. *See, e.g.,* United States v. Lewis, 716 F.2d 16, 19 (D.C.Cir.), *cert. denied,* 464 U.S. 996 (1983); Scarborough v. State, 437 A.2d 672 (Md. 1981); People v. Ricardo B., 518 N.Y.S.2d 843, 847 (N.Y.App. Div.), *appeal granted,* 514 N.E.2d 1376 (N.Y. 1987), *order affirmed by,* 535 N.E.2d 1336 (N.Y. 1989).

Aside from this competing commentary, these same courts universally agree that the multiple jury process is constitutional and that a conviction obtained thereunder will be upheld, absent specific instances of reversible prejudice.[5] California's approach to this issue aptly illustrates the point.

In People v. Harris, 767 P.2d 619 (Cal. 1989), the court examined use of multiple juries in a murder, kidnapping, and robbery trial. The issue was one of first impression at the California Supreme Court level. As a result, the opinion serves as a thorough and historical review of the multiple jury device.

Defendant Harris and his confederate Davidson were charged with the robbery, kidnapping, and murder of a seventeen-year-old individual. Both men abducted the victim during a dairy/convenience store holdup. They drove the victim to a secluded part of the desert and shot him in the back as he was attempting to

---

[5]We have not uncovered one decision where a court has held that the multiple jury device is inherently prejudicial, warranting automatic reversal of the subject conviction.

flee. Harris and Davidson were tried together with the trial court empaneling two juries. Multiple juries were used because extra-judicial statements made by Davidson implicated Harris. The prejudicial impact of these statements was effectively eliminated by excusing the Harris jury when this evidence was introduced at trial. Harris was convicted of all three crimes. *Id.* at 623-30.

On appeal, Harris attacked the validity of using multiple juries, claiming that it was unduly prejudicial. Specifically, he alleged that the procedure was cumbersome, increased the duration of the trial, frustrated the jurors with unnecessary delay, and invited individual jurors to speculate that damaging evidence was being considered by the court while they were excluded. Harris also asserted that the procedure was not expressly authorized under California law. *Id.* at 633-34.

The court rejected all these contentions and held that empaneling multiple juries was an acceptable way to facilitate the mandate of California Penal Code § 1098, which requires that the accused "be tried jointly, unless the court orders separate trials." The court reasoned that multiple juries eliminated the prejudice of antagonistic defenses of codefendants and still maintained the advantages of a joint trial. The court specifically referenced saving judicial resources, diminishing inconvenience to witnesses and public authorities, and avoiding delay in the administration of justice. *Harris,* 767 P.2d at 633.

The court also reasoned that it was wrong to summarily dismiss the multiple jury process based on novelty alone. Instead, it adopted the universal position taken in other jurisdictions that using multiple juries is not inherently prejudicial. *Id.* at 634-37. Rather, convictions obtained by using the device would be upheld unless the defendants could identify particular instances of reversible prejudice.

The *Harris* court then subjected appellants' claims of prejudice to individual examination and the harmless error rule. In short, the court determined that Harris simply did not substantiate that his trial was unduly prejudicial. The record indicated that the process was administered effectively, the issues were not proce-durally complex, the jurors were separately instructed and advised regarding the process, and the call of witnesses was scheduled to minimize continual shuffling of jurors. In light of the overall record, the court held that Harris could not prove that his trial results would have been more favorable had he been tried in a separate proceeding. *Id.* at 637.

In essence, we agree with the California Supreme Court's approach to appellate review of convictions obtained using the

multiple jury process. A conviction obtained thereunder will be upheld absent specific instances of reversible prejudice.

Yet unlike the *Harris* decision, we do not share the California Supreme Court's apparent optimism regarding the use of multiple juries. The case at hand illustrates that the device can become a breeding ground for confusion in process and results alike. What should have been a relatively simple trial took four weeks to conduct in the lower court. Much of the time, expense, and confusion complained of on appeal was the natural result of having three different defense lawyers practicing law in front of three different juries. The length of the trial, the curious results of the verdicts, and the length of this appeal indicate that the multiple jury process should be engaged with great caution.

In addition to these administrative concerns, the Nevada Rules of Criminal Procedure do not authorize empaneling multiple juries. Unlike some federal courts and state courts in other jurisdictions, our rules do not contain any provisions or language sanctioning the procedure. *See, e.g.,* United States v. Sidman, 470 F.2d 1158, 1170 (9th Cir. 1972) (finding authority under Fed. R. Crim. P. 57, granting trial court power to "proceed in any manner not inconsistent" with rules), *cert. denied,* 409 U.S. 1127 (1973); *Harris,* 767 P.2d at 633 (interpreting California Penal Code § 1098, requiring that defendants "must be tried jointly, unless the court orders separate trials"). NRS 174.165 merely states that the trial court may grant separate trials and "provide whatever relief justice requires." This language cannot mean that a trial judge has the authority to empanel thirty-six jurors and alternates to hear the joint trial of three codefendants.

Our skepticism is further enhanced by the fact that this court has not approved any guidelines for steering the district court through such an ambitious and complicated process. Jurisdictions outside Nevada have cautioned against experimentation with multiple juries in the absence of instructive guidelines. *See, e.g.,* State v. Watson, 397 So.2d 1337, 1342 (La.), *cert. denied* 454 U.S. 903 (1981). Again, our trepidation has been solidified by the facts of the instant appeal. The court below empaneled three juries to hear the respective trials of Webb, Ewish, and Nelson. As a result, the threat of prejudice and impropriety was multiplied by three. The procedure is administratively cumbersome with two juries present, and it appears nearly unworkable ushering thirty-six individuals plus alternates in and out of the courtroom.

Based upon the foregoing, we conclude that the trial court's maiden voyage with the multiple jury device was unauthorized by Nevada's Rules of Criminal Procedure and this court. Yet remaining consistent with the great weight of authority in other

jurisdictions, we conclude that novelty alone is not enough to reverse appellants' respective convictions. *See, e.g., Hayes,* 676 F.2d at 1359; Smith v. DeRoberts, 758 F.2d 1151 (7th Cir.), *cert. denied,* 474 U.S. 838 (1985); United States v. Rimar, 558 F.2d 1271 (6th Cir.), *cert. denied,* Barber v. United States, 434 U.S. 984 (1977); United States v. Rowan, 518 F.2d 685 (6th Cir.), *cert. denied,* Jackson v. United States, 423 U.S. 949 (1975); People v. Wardlow, 173 Cal.Rptr. 500 (Ct.App. 1981). Therefore, we turn to the specific claims of prejudice forwarded by Webb and Ewish.

### III. *Prejudice as result of the multiple jury process*

Webb and Ewish both claim that using multiple juries denied them their right to a fair trial. In essence, appellants argue that cross-examination of all common witnesses by each defense lawyer in front of all three juries resulted in unwarranted finger pointing. Without offering an exhaustive list of examples, the following were specifically referenced by appellants on appeal.

Webb filed a motion in limine to exclude any references to his gang affiliation. The court delayed its ruling. At trial, the following questioning took place during the direct testimony of Benjamin Strebel ("Strebel") before all three juries:

Q. What do you remember Tim Webb saying?
A. He pulled up and said, "What's up, Blood?" And I had just off [sic] work from the car wash and I had my car wash uniform on. He said, "Why are you wearing all that red?"

Follow-up led to this question:

Q. Now, what is it after the initial conversation which you have described about what you were wearing, why you were wearing all the red, what was it after that that Tim Webb said about Bobby Blackwell?

Webb's counsel objected to the reference of the words "blood" and "red," claiming that they indicated Webb's gang involvement. The court disagreed and found these statements spontaneous. Yet after urging from Webb's counsel, the court apparently granted the motion in limine and advised that no further gang references could be made in the presence of the Webb jury.

Later, cross-examination of Strebel, by Ewish's counsel, resulted in a second "gang reference":

Q. And he [meaning defendant Webb] also said, "What's up, Blood?" and he started sweating you, is that correct?
A. Yes.

On appeal, Webb claims that the above line of questioning

violated the court's prohibition of gang references and would not have occurred in a separate trial.

Ewish also makes claims of undue prejudice. As an example, Ewish asserts that cross-examination of Eppie Lopez's mother resulted in improper testimony being admitted against him. Specifically, Maria Lopez referenced her son's friendship with codefendant Nelson. Ewish asserts that testimony of this friendship not only exonerated Nelson, but improperly implicated him in the firebombings. Ewish correctly points out that this testimony would not have been presented to his jury if the trials had been severed.

While we agree that there was additional antagonism at trial directly attributable to the multiple jury process, such instances do not merit reversal. As a general proposition, defendants are not entitled to a retrial simply because their defense is antagonistic to a codefendant. Some form of prejudice always exists in joint trials and such occurrences are subject to harmless error review. NRS 178.598 (any trial defect not impacting substantial rights is disregarded); *see also* Mitchell v. State, 105 Nev. 735, 738-39, 782 P.2d 1340, 1342-43 (1989) (harmless error standard applied to joinder of claims; court tacitly recognized that same standard applied to joinder of defendants); Abram v. State, 95 Nev. 352, 356, 594 P.2d 1143, 1145 (1979) (reversal unwarranted where appellant could not prove prejudicial testimony made a difference in his conviction).

In the instant case, the few references to "blood" and "wearing red" were innocuous, considering that the statements were made during the course of a four-week trial. *See* Emmons v. State, 107 Nev. 53, 807 P.2d 718 (1991) (one ambiguous reference to defendant's incarceration during four-day trial was harmless error). Moreover, this language did not directly label Webb as a gang member, and it is unclear whether or not a jury would understand the comments as being gang related. The district judge properly characterized the impact to the jury by the following comments made while considering a related motion for mistrial: "The gang references, frankly, [were] so inconsequential, to me . . . that I didn't even remember it after your points and authorities."

Similarly, Maria Lopez's reference to her son's friendship with codefendant Nelson was also inconsequential considering the length and complexity of the overall trial. Certainly, such statements, and any inference drawn therefrom, did not make a difference in Ewish's convictions.

Each of the foregoing examples illustrates the natural form of antagonism inherent in nearly every joint criminal trial. We conclude that the examples, and all other claimed instances of prejudice appearing in appellants' briefing papers, are harmless in light of the overall record. Simply, appellants would not have fared any better at separate trials. The allegedly improper cross-examination testimony did not differ significantly from the testimony brought out on direct examination. Webb and Ewish would still have faced the same incriminating statements coming from the same witnesses in separate proceedings.

More importantly, there was overwhelming evidence that Webb and Ewish were guilty of arson and murder. Webb took the stand and admitted throwing the Molotov cocktail into the Newton home. Both Webb and Ewish did not dispute the fact that they were present at the time of both firebombings. The three codefendants were using Ewish's car. There was testimony that Ewish and Webb bragged about the killings and admitted to their direct involvement in the crimes. Considering this evidence and the weak nature of appellants' respective defenses (voluntary intoxication and lack of capacity to form specific intent for aiding and abetting), any prejudice experienced by appellants does not warrant reversing their respective convictions.

In spite of the above conclusion, we dissuade any reader from misconstruing this disposition. This opinion is not an endorsement of the multiple jury device. If not implemented carefully or in the proper circumstances, using multiple juries to administer criminal trials becomes a breeding ground for curious results, tainted justice, and issues for appeal. Without guidelines authorized by this court or sanction from our state's legislature, the courts of this state are instructed to refrain from conducting trials in this manner.

## IV. *Remaining allegations of error*

In addition to the above, Webb and Ewish make other allegations of error that do not merit extended discussion. First, both appellants contend that their respective convictions were not supported by sufficient evidence. The record on appeal, as indicated above, proves otherwise. In light of the overwhelming evidence supporting Webb's and Ewish's guilt, we conclude that appellants' respective convictions were supported by substantial evidence. Bolden v. State, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981). Certainly, a reasonable jury could have convicted both appellants on all counts at issue in this appeal. Edwards v. State, 90 Nev. 255, 259, 524 P.2d 328, 331 (1974).

Second, Ewish separately claims that his jury was improperly instructed on deadly weapons sentence enhancement, codified in NRS 193.165. As a result, he claims his murder sentences were improperly increased. Ewish forwards this contention of error without having objected to the instruction at trial. He also failed to offer any alternative instruction for the district court's consideration. The subject instruction did not amount to plain error, and thus, we will not consider the intricacies of Ewish's argument on appeal. Johnston v. State, 101 Nev. 94, 95, 692 P.2d 1307, 1307 (1985).

As a final point of error, Ewish claims that the State's indictment allegations did not match its aiding and abetting theory of conviction at trial. He asserts that the State's indictments allege that he was directly responsible for the acts constituting arson. Thus, he was inadequately apprised of the State's theory of conviction. Ewish cites this court's opinion in Barren v. State, 99 Nev. 661, 669 P.2d 725 (1983), as authority.

We disagree. The State's indictments alleged that Nelson threw the Molotov cocktails while Ewish and Webb encouraged the actions. The indictments also stated that Ewish entered into an agreement with the other two codefendants and acted as a lookout. While these charges do not expressly list aiding and abetting, it is clear that this was one of the State's theories of conviction.

Unlike the facts of *Barren* where the defendant was purposely disadvantaged by the State in not apprising him of the theory of conviction until the opening statements at trial, Ewish was adequately informed, considering the extent of the State's knowledge, of the nature and nuances of the State's charges against him. In addition, even assuming that there was some defect in the charging allegations, Ewish does not allege that he suffered any prejudice at trial as a result. *See* Point v. State, 102 Nev. 143, 149, 717 P.2d 38, 43 (1986) (appellant must show how insufficient indictment proved prejudicial). In fact, the record shows that Ewish was aptly represented and put on a thorough defense to the aiding and abetting charges.

Having found no impropriety in the charging allegations or any prejudice in the record, we conclude that this claimed point of error fails.

## CONCLUSION

In light of the foregoing, we conclude that all Ewish's arguments on appeal lack merit. Although the multiple jury system may have resulted in some form of prejudice, this was harmless considering the overall trial record. Accordingly, we affirm

Ewish's convictions for arson and murder and his accompanying sentences.

Similarly, we affirm Webb's arson and murder convictions stemming from the Lopez firebombing. Any improprieties in Webb's trial were rendered harmless by the strength of the State's overall case. However, we reach a different conclusion concerning Webb's arson conviction for his involvement in the Newton incident. Concerning that charge, the district court erred by not instructing the jury on the lesser related crime of explosive destruction. Therefore, we reverse Webb's arson conviction for the Newton firebombing and remand for a new trial.

Rose, C. J., and Steffen, J., concur.

Shearing, J., with whom Springer, J., joins, concurring:

I concur in the result of this case, but I do not agree that the courts of this state should refrain from using multiple juries. Our courts should be encouraged to be innovative in reducing time and expense of trials, as long as the basic rights of the defendants are preserved. Trials with multiple juries are particularly beneficial to the victims because they are not subject to repeated court appearances.

The majority opinion suggests that having multiple juries took more time and expense than three separate trials would have taken. I do not believe the appellate court is in the position to make that determination. The trial judge is in the best position to determine whether the advantages of multiple juries outweigh the benefits. The trial judge should be given maximum discretion to conduct trials in the most efficient manner possible.