1998 OK CR 73

**Michael Lee WILSON, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F 97–491.**

Court of Criminal Appeals of Oklahoma.

Dec. 31, 1998.

Rehearing Denied Feb. 22, 1999.

Joe P. Robertson, Kent R. Hudson, Indigent Defense System, Capital Trial Division, Tulsa, OK, for defendant at trial.

William LaFortune, District Attorney, Brett Swab, Assistant District Attorney, Tulsa, OK, for the state at trial.

William H. Luker, Julie L. Gardner, Appellate Defense Counsel, Capital Direct Appeals Division, Indigent Defense System, Norman, OK, for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer B. Miller, Assistant Attorney General, Oklahoma City, OK, for appellee on appeal.

### OPINION

LANE, Judge.

¶ 1 Appellant, Michael Lee Wilson, was charged conjointly with the codefendants [1] with the crimes of, count one, first degree malice murder and, in the alternative, first degree felony murder, 21 O.S.1991, § 701.7(A & B) and, count two, robbery with a dangerous weapon, 21 O.S.1991, § 801 in Tulsa County District Court, Case No. CF–95–1024. The State filed a Bill of Particulars alleging three aggravating circumstances. A jury trial was held before the Honorable E.R. "Ned" Turnbull, District Judge. The jury found Wilson guilty of first degree murder and robbery with a dangerous weapon. After the punishment stage, the jury found the existence of all three aggravating circumstances: the murder was especially heinous, atrocious or cruel, the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, and the existence of a probability that the defendant would commit criminal acts of violence that

---

1. Codefendants were Billy Don Alverson, Darwin D. Brown and Richard Harjo. Darwin D. Brown was tried conjointly with Wilson and appeals under Oklahoma Court of Criminal Appeals case number F 97–493. Alverson appeals under case number F 97–1024. Harjo appeals under case number F 97–1054. Wilson and Alverson were also sentenced to death. Harjo was sentenced to life without the possibility of parole.

would constitute a continuing threat to society. 21 O.S.1991, § 701.12(4),(5) & (7).

## I. FACTS

¶ 2 Michael Wilson and Richard Yost were employees at the QuikTrip convenience store located at 215 North Garnett Road in Tulsa, Oklahoma. Wilson and his friends planned to rob the convenience store at least two weeks before this crime actually occurred. The plan commenced on February 25, 1995. Wilson had completed his shift at 11:00 p.m. with Yost beginning his shift at that time. Wilson and his three friends came into the store during the early morning hours of February 26 and waited for the most opportune time to accost Yost. The Quik-Trip surveillance camera captured the events as they unfolded. The video of the events is quite telling.

¶ 3 Yost was cleaning the windows on the coolers with Wilson and the codefendants surrounding him. As Yost was walking near a passage way to the back room, all four defendants attacked him and dragged him to the back room. One of the defendants, identified as Billy Alverson, came back out and picked up some items that were knocked from the shelves and kept watch for customers. A few moments later, Alverson and Richard Harjo walked out the front door of the store. While they were going out, Yost was yelling and screaming for help, possibly thinking that a customer had entered the store. Alverson and Harjo re-entered the store with Harjo carrying a black aluminum baseball bat. He carried the bat to where Yost had been taken. The surveillance camera picked up the sounds of the bat striking Yost. Circumstantial evidence showed that the baseball bat struck the handcuffs on Yost's wrists which Yost was holding above his head to ward off the blows. As the blows were being struck, Wilson walked from the back room, checked his hands, put on a Quik-Trip jacket, got behind the counter and tried to move the safe. While Wilson was behind the counter, several customers came in. Wilson greeted them with a friendly greeting, sold them merchandise, then said "thank you, come again" or "have a nice day."

¶ 4 All this time Wilson continued to try and pull the safe from underneath the counter. He took money from the cash drawer and pulled money out of the currency change machine. At some point after this, Wilson left the counter area and took the video from surveillance camera recorder. The defendants then loaded the safes into Wilson's car using a dolly from QuikTrip.

¶ 5 Yost's body was discovered by Larry Wiseman, a customer, at about 6:00 a.m. Yost was laying on the floor in a pool of blood, milk and beer. Yost's ankles were taped together with duct tape. One handcuff was found near Yost's body. The other cuff was missing from the scene. Detectives learned that Wilson was at the store between the hours of 4:00 a.m. and 6:00 a.m.

¶ 6 Wilson failed to show up for work at the scheduled time of 3:00 p.m. on the same day. Officer Allen set up surveillance on Wilson's house and at about 4:00 p.m. he spotted Wilson get into a gray vehicle. The vehicle was stopped. Wilson was taken into custody. Also arrested were the other occupants in the vehicle: codefendants Alverson, Harjo, and Darwin Brown. Large sums of money were recovered from all of the defendants except Wilson.

¶ 7 Wilson was questioned by Detective Folks. He told Folks that they planned on robbing the QuikTrip and that he knew Yost would be killed. He said that they had been talking about the robbery for about two weeks. The plan was for him to assume the role of sales clerk once Yost was "taken care of."

¶ 8 Officers searched Alverson's place of abode where they discovered the drop safe, the dolly, QuikTrip glass cleaner, money tubes and the store surveillance video tape. A search was conducted of Wilson's house but nothing of value was discovered. The next day Wilson's mother called Officer Makinson to come to her house. Once there, the detectives found several items of evidence on the front porch, including the baseball bat, a bloody QuikTrip jacket with Yost's name on it, Wilson's Nike jacket matching the one worn in the store video and the other cuff of the set of handcuffs.

¶ 9 Wilson raises twenty propositions of error in his appeal. These propositions will be addressed as they arose at trial.

## II. DUAL JURY ISSUES

¶ 10 In proposition one, Wilson raises several sub-issues concerning the use of dual juries in this case. Although he was tried conjointly with codefendant Brown, each defendant had a separate jury deciding their fate.

■ ¶ 11 In *Cohee v. State*, 1997 OK CR 30, Guideline 2, 942 P.2d 211, 213, a majority of this Court set forth Guidelines Governing Juries in Criminal Trials which included approval of the use of dual juries in cases where codefendants are charged. Very little guidance was given to trial courts in the implementation of this procedure except for the provision that:

> [b]oth juries will be seated in the jury box and the evidence pertaining to both defendants will be presented to both juries simultaneously. Evidence admissible as to one co-defendant shall be presented to that defendant's jury only.

*Cohee*, 942 P.2d at 213. We now have before us Wilson's claim that the dual jury system is not authorized under Oklahoma law and the procedure violates a defendant's constitutional rights. We previously ruled, in an "Extraordinary Writ" action by Wilson's codefendants, that the trial court has the discretion to implement a dual jury procedure because Oklahoma law does not prohibit such a procedure.[2] Under the theory of collateral estoppel (issue preclusion), "once a court has decided an issue of fact or law necessary to its judgment, that issue may not be re-litigated between the same parties or their privies in a suit on a different cause of action." *Wilson v. Kane*, 1993 OK 65, n. 23, 852 P.2d 717, 727.[3] Therefore, the principle of collateral estoppel prevents Wilson from raising the issue of whether the dual jury procedure is authorized in Oklahoma. However, Wilson's arguments regarding the dual jury procedure's effect on his rights are ripe for review.

■ ¶ 12 We first note that the jurisdictions which have approved the use of a dual jury system or multiple jury process require a defendant to show actual prejudice from the use of this novel approach to multiple defendant trials.[4] We find this approach comports with Oklahoma law. The use of the multiple jury process is constitutional, and a conviction had with the use of the multiple jury system will be upheld absent a showing of specific prejudice.

¶ 13 Wilson first claims that the dual jury system has a chilling effect on effective cross-examination. He claims that this problem was magnified when the trial court instructed defense counsel that it is the responsibility of attorneys for the State and defense to advise the Court of testimony which will make it necessary to have the juries separated. The trial court told the attorneys that they would have to work a little harder and that the trial court did not anticipate that any of the attorneys would purposely taint the proceedings in front of the jury.

---

2. Wilson's codefendants filed Petitions for Extraordinary Relief prior to the commencement of this trial asking that the trial court be prohibited from using a dual jury system. We denied the Petitions holding that Oklahoma law did not preclude the trial court from exercising his discretion and impaneling dual juries. *Harjo et al. v. Turnbull*, Order Denying Petitions for Extraordinary Relief, Nos. P 96–1258, P 96–1266, P 96–1278 (Okl.Cr. January 14, 1997) (not for publication).

3. For a discussion of the differences between collateral estoppel and res judicata see *Miller v. Miller*, 1998 OK 24, ¶¶ 22–26, 956 P.2d 887, 896–97.

4. *People v. Hana*, 447 Mich. 325, 524 N.W.2d 682, 693 (1994); *Ewish v. State*, 110 Nev. 221, 871 P.2d 306, 313 (1994), *reversed on other grounds*, 111 Nev. 1365, 904 P.2d 1038; *People v. Cummings*, 4 Cal.4th 1233, 18 Cal.Rptr.2d 796, 850 P.2d 1, 35 (1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994); *State v. Bowman*, 588 A.2d 728, 734 (Me.1991); *State v. Beam*, 109 Idaho 616, 710 P.2d 526, 534 (1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986), *sentence vacated on other grounds in Beam v. Paskett*, 3 F.3d 1301, 1304 (9th Cir.1993), *cert. denied*, 511 U.S. 1060, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994); *United States v. Lewis*, 716 F.2d 16, 19 (D.C.Cir.1983), *cert. denied* 464 U.S. 996, 104 S.Ct. 492, 78 L.Ed.2d 686 (1984).

¶ 14 Wilson claims that the spectacle of removing one jury during the course of the trial would place, in the removed juror's minds, the idea that something bad was about to be said about their respective defendant. Therefore, Wilson proposes that defense counsel is in a quandary to either engage in prejudicial cross-examination or create a spectacle of jury removal.

■ ¶ 15 We fail to see the quandary here. The better course is to remove the jury which may be subject to information that they would otherwise be prohibited from hearing. The jury should be instructed, as is done when bench conferences or objections are ruled upon, that they are not to speculate about what went on in their absence and not to hold it against the defendant for whose fate they were deciding.

■ ¶ 16 The trial court, in its initial instructions, told both juries that they would be removed from the court room when evidence was presented that did not pertain to their particular defendant. The trial court asked the jury collectively if they could assure the court that they would "not attempt to draw any inference, or come to any conclusions, or guess at what evidence may be presented or is being presented at the time when you were outside of the courtroom." The jury collectively answered in the affirmative.

¶ 17 We believe that the trial court's instructions to the jury correctly informed them of their duty. We have not found, nor has Wilson presented a record, that they did not follow this admonishment.

¶ 18 Wilson claims that the dual jury system creates a conflict of interest for defense counsel because he must not only represent his client, but must also strive to protect the codefendant during his presentation of witnesses or cross-examination when both juries are present. Wilson cites *Holloway v. Arkansas*, 435 U.S. 475, 488–91, 98 S.Ct. 1173, 1180–82, 55 L.Ed.2d 426 (1978), for the proposition that when a conflict of interest is present, prejudice is presumed.

¶ 19 In *Holloway,* counsel was required to represent three different codefendants who had conflicting interests. Trial counsel,

as an officer of the court, had filed pre-trial motions advising the trial court of a possible conflict of interest and requested separate counsel. This motion was denied. The Court in *Holloway* determined that when trial counsel, as an officer of the court, claims that a possible conflict of interest will occur because of joint representation, the failure to take adequate steps to resolve the conflict constitutes reversible error. *Holloway,* 435 U.S. at 486–87, 98 S.Ct. at 1180.

■ ¶ 20 In this case, each defendant had separate counsel. Therefore, counsel was not faced with the problems occurring in *Holloway.* The only obligation Wilson's counsel had to the codefendant was to inform the judge when his questions would lead to answers which would not be admissible in the trial of the codefendant. If objectionable questions and answers were presented, it was the responsibility of the codefendant's attorney to raise an objection. At that point it was the trial court's responsibility to determine whether the questioning was prejudicial to the codefendant. We do not believe that the responsibility placed upon trial counsel chilled cross-examination in this case.

¶ 21 Wilson does not identify specific instances where his counsel was acting under an actual conflict of interest. Instead, Wilson points to the fact that his trial counsel failed to cross-examine several witnesses and failed to conduct a thorough cross-examination of Roy Heim, which would have further developed the theory that Wilson was less culpable than the other defendants. The witnesses not cross-examined by Wilson testified about the store operations, finding Yost's body and observing Wilson in the QuikTrip between 5 and 6:00 a.m. the morning of the crime.

¶ 22 Whether to cross-examine witnesses is a decision left to trial counsel and is a valid trial strategy. *Le v. State,* 1997 OK CR 55, ¶ 64, 947 P.2d 535, 557, *cert. denied,* —— U.S. ——, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). Wilson has not shown that the failure to cross-examine these witnesses caused him to be prejudiced. We have reviewed the testimony and find that the failure to cross-examine these witnesses was based on trial strate-

gy and not on the dual jury system. The lack of cross-examination of Heim regarding the blood trail from the back room toward the register area and the lack of blood behind the register was likewise a decision of strategy. The videotape showed Wilson remaining in the back room after the bat was brought in. The diagram of the scene clearly indicated a lack of blood behind the registers where Wilson was subsequently stationed. Whether or not Wilson created the blood trail was not the determining factor in his conviction and sentence.

¶ 23 Next, Wilson claims that the dual jury system deprived him of a jury of his peers. One of the jurors in his jury pool, Juror Foster, was scheduled to be a character witness for codefendant Brown. Juror Foster was removed for cause. Foster stated that she could be a fair juror to Wilson, so Wilson claims that the prosecutor should have been required to use a preemptory challenge to remove her. Given the nature of Foster's connection with this case and her relationship with Brown, we cannot say that the trial court abused its discretion in excusing her for cause.

¶ 24 Wilson also claims that he was prejudiced by the dual jury system because his jury was sitting closer to the victim's family than the codefendant's jury. The trial court instructed the victim/witness coordinator to tell the family members not to talk during the trial and to leave the courtroom if they became emotional. We find that no error occurred as a result of the seating arrangement.

¶ 25 Wilson's next claim concerns the introduction of evidence which was inadmissible against him. He claims that evidence was introduced which was more prejudicial than probative on the issue of his guilt and his sentence. His argument rests on the premise that he was not directly involved in the beating death of the victim while his codefendant was; however, the evidence was introduced while both juries were present in the courtroom. This evidence included the testimony of medical examiner Dr. Distefano and photographs of Yost's body and injuries.

¶ 26 Wilson complains about Dr. Distefano's first stage testimony which went beyond the cause of death. We find that the testimony was relevant. It is arguable that Wilson was present at least during the time the first blows with the baseball bat were struck. Furthermore, the State was attempting to prove either felony murder or malice murder. To prove malice murder the State had to prove intent to kill. The testimony regarding the injuries and the bloody crime scene were relevant to show the cause of death and to show an intent to kill.

¶ 27 Wilson also complains about second stage evidence showing wounds to the hands and autopsy pictures of Yost's head, body and skull. This evidence was relevant against Wilson to show the violent manner in which Yost died and to show the heinous, atrocious or cruel aggravating circumstance.

¶ 28 Before leaving the issue of dual juries, we would be remiss if we did not caution the trial courts in Oklahoma to bear in mind that the dual jury procedure has the potential for engendering error, especially in complex cases. The procedure "requires great diligence on the part of the trial judge and cooperation of the attorneys to take the precautions necessary to ensure due process throughout the joint trial." *State v. Padilla*, 125 N.M. 665, 964 P.2d 829, 834 (N.M.Ct. App.1998).

### III. VOIR DIRE ISSUES

¶ 29 Wilson claims, in proposition thirteen, that the manner in which the trial court conducted voir dire violated his constitutional rights. He first claims that the trial court placed undue emphasis on the jurors' views on capital punishment during the death penalty qualification portion of voir dire. The trial court first began the death qualification portion of voir dire by asking individual jurors their view on the death penalty. Follow up questions were then asked based on the jurors' response to the initial question. Wilson claims the trial court erred by asking jurors their views on the death penalty because jurors opposed to the death penalty were removed from the jury panel. We have held that:

not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

*Allen v. State,* 1994 OK CR 13, ¶ 23, 871 P.2d 79, 90–90, *cert. denied,* 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (citations omitted).

¶ 30 We find that what Wilson is complaining about is the order in which the trial court asked voir dire questions regarding the death penalty. The better approach is to use the voir dire questions and order set forth in OUJI–CR 2d, 1–5 (1996). However, we find that the manner in which the trial court conducted voir dire in this case was not error. There is nothing to indicate that the jury was bent on delivering the death penalty nor is there anything to indicate that otherwise qualified jurors, who could put personal feelings aside, were excluded.

¶ 31 The trial court's follow-up questions were designed to determine whether the jurors' personal views on the death penalty would impair their ability to render an impartial verdict. Of the five jurors which Wilson complains about, three were excused because they were against the death penalty and said that they would automatically vote against it, regardless of the evidence and the law; one said he was in favor of the death penalty, but his conscience would not allow him to impose it; and one said she was in favor of the death penalty but, her religious convictions would not allow her to impose it. Likewise, the trial court excused potential jurors who would automatically impose the death penalty regardless of the law and evidence. The trial court did not show partiality to one view or the other.

¶ 32 Wilson complains that he was not allowed to rehabilitate these jurors. However, neither did the trial court allow the State to rehabilitate jurors who said that they would automatically vote for the death penalty. The trial court is not required to allow the parties to rehabilitate potential jurors. *Duvall v. State,* 1991 OK CR 64, ¶ 25,

825 P.2d 621, 631, *cert. denied,* 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992). Therefore, there was no error in the questioning of potential jurors regarding their views on the death penalty.

¶ 33 Wilson next complains that the trial court did not conduct individual voir dire. He claims that the failure to do so educated jurors as to how they could be removed from jury service by expressing their desire to automatically vote one way or the other on the sentence of death. An appellant may request individual voir dire, but he has no automatic right to such a request. *Willingham v. State,* 1997 OK CR 62, ¶ 5, 947 P.2d 1074, 1078.

¶ 34 There is no evidence that the potential jurors were anything but candid in their answers to the trial court's questioning. Thus, the trial court did not abuse its discretion in failing to hold individual voir dire.

## IV. FIRST STAGE ISSUES

### A.

¶ 35 In proposition two, Wilson claims that certain evidence obtained as a result of his arrest should have been suppressed because the arrest was made without probable cause. Wilson specifically complains about the introduction of his confession to Detective Folks and waivers of rights signed by him. Wilson also asserts that nearly all of the evidence was gathered as a direct result of his arrest.

¶ 36 The State claims that Wilson waived the issues in this proposition by failing to properly object to the introduction of this evidence. "[T]o properly preserve objections to the introduction of evidence … a timely objection must be made when the evidence is sought to be introduced." *Luna v. State,* 1992 OK CR 26, ¶ 5, 829 P.2d 69, 71.

¶ 37 Just before Folks was preparing to testify about Wilson's statements to him while he was in custody, Wilson's attorney objected stating that he was relying on the grounds raised in the earlier in-camera hearings. The timing of this objection indicates

that Wilson was referring to the admissibility of the statements.

¶ 38 A suppression hearing was held on October 30, 1996. Wilson indicated that he did not have a motion to suppress pending at that time and did not wish to raise the issue at that time. Later, during a motion hearing on January 30, 1997, Wilson orally objected to the introduction of both the confession and the waiver of rights forms because they were obtained as a result of an "illegal" arrest. Wilson, unlike the codefendants, never filed a motion to suppress and never litigated the oral objection he made to the evidence. While Wilson's trial counsel could have been more eloquent in his contemporaneous objection, we find that this issue is properly preserved for review. Finding that this issue is preserved, we begin by determining whether probable cause existed at the time of the arrest.

> The dispositive issue in determining whether a felony arrest is legal is whether the arresting person had probable cause, or reasonable cause, to make the arrest. One may make a warrantless felony arrest based on information communicated to him by others, if that information provides reasonable cause for the arrest. The State is not bound to prove that a felony was actually committed in order to justify such an arrest; as long as reasonable cause existed to believe the person committed a felony, the arrest, whether by peace officer or private citizen, is valid, even though it may later turn out that no felony was committed. Fruits of a search incident to such an arrest would generally be admissible. On the other hand, if the arrester did not have reasonable cause to believe the person committed a felony, the fruits of a search incident to the arrest are inadmissible.

*Tomlin v. State,* 1994 OK CR 14, ¶ 19, 869 P.2d 334, 338 (citations omitted).

¶ 39 Wilson was taken into custody at about 5:45 p.m. on February 26, 1996, by Sergeant Allen and other officers of the Tulsa Police Department. At the time Wilson was taken into custody, Allen was aware of the following facts: Wilson was identified as being at the store, behind the counter, between 5:00 a.m. and 6:00 a.m; Wilson's vehi-

cle had been seen at the crime scene during the early morning hours of the 26th; the crime scene was discovered sometime before 6:15 a.m.; a large safe had been taken from behind the counter; the video tape from the security monitor had been taken; money from the cash register was taken; a large amount of five dollar bills were taken; Wilson had worked the evening shift the night before, and was not scheduled to work again until 3:00 p.m. on the 26th; and Wilson did not show up for work at that time.

¶ 40 Allen observed Wilson get into a vehicle on the passenger side. That vehicle was stopped a few minutes later at the direction of Allen, because Allen intended to take Wilson into custody for the robbery and homicide. When the vehicle in which Wilson was a passenger was stopped, Wilson was arrested immediately for the robbery and homicide at the QuikTrip. A large amount of five dollar bills were discovered in the pocket of codefendant Harjo just after Wilson was taken into custody.

¶ 41 We believe these facts were reliable and it was reasonable for Allen to have relied on these facts in determining whether he had probable cause to arrest Wilson. The trial court did not err in allowing the introduction of Wilson's waiver of rights form and his confession.

**B.**

¶ 42 In propositions three and five, Wilson complains about the introduction of DNA test results. Wilson first argues, in proposition three, that the trial court erred in allowing the introduction of DNA test results without holding a hearing on the reliability of the tests. At trial Wilson did not object to the admission of the DNA evidence on the basis that the evidence was unreliable or irrelevant. Wilson only objected that the results of the tests should not be admitted because the results had not been turned over to him until a few days prior to trial. Therefore, based on this particular argument, he has waived all but plain error.

¶ 43 The DNA test used was the PCR or Polymerase Chain Reaction test. Prior to Wilson's trial, this specific test had

not been approved by this Court. However, in *Wood v. State*, 1998 OK CR 19, ¶ 40, 959 P.2d 1, we determined that the PCR test was reliable and admissible in the State of Oklahoma. We find that the introduction of the DNA PCR test results did not amount to plain error.

¶ 44 Wilson complains in proposition five that the trial court abused its discretion in allowing the introduction of the DNA test results in violation of the Oklahoma Discovery Code. Wilson argues alternatively that the trial court should have granted a continuance so that defense counsel could have time to rebut the State's evidence.

■ ¶ 45 In response to Wilson's discovery motion, the prosecution notified Wilson's counsel, by phone, on Friday January 24, 1997, ten days before trial, that he could come by and pickup additional discovery, which consisted of a copy of the entire file. On January 27, trial counsel obtained the discovery material. Wilson now complains that this notice was insufficient and as such that several items of tangible evidence, witness testimony and the results of scientific tests should have been excluded from the trial.

¶ 46 Title 22 O.S.1991, § 2002, provides, in part, that the State shall disclose, upon request by the defense, "names and addresses of witnesses which the State intends to call at trial" with their statements or summaries thereof, any results of scientific tests, experiments or comparisons and any tangible objects which the prosecution intends to use in the trial.

¶ 47 It appears that codefendant Brown's counsel filed all of the motions to exclude and argued the motions and Wilson's counsel merely joined in the motions. The trial court denied the request for the exclusion of this evidence. Counsel asserted that he did not learn the results of the forensic analysis until he picked up the materials on January 27, 1997. During the motion hearing on January 27, the prosecutor stated that he had made a statement at a prior motion hearing that the DNA reports would be available for all parties. The trial court also recalled the statement. Some mention was made that this occurred at the hearing held on October 30,

1996, but the transcript of that hearing does not contain such statements. The trial court did not recall whether the conversation was on the record or not. The trial court took counsel's motion to exclude the evidence under advisement and gave the attorneys time to read the reports and appear at a later date. The trial court specifically found that the State complied with the discovery code by disclosing the evidence on January 24. On February 3, 1997, the trial court denied counsel's motion to exclude the DNA evidence and the motion for a continuance.

■ ¶ 48 Based on the facts available to the trial court, we cannot say that the trial court abused its discretion in finding that the State complied with the Discovery Code. Furthermore, the trial court did not abuse its discretion in failing to exclude the DNA evidence or in failing to grant a continuance.

¶ 49 In proposition six, Wilson complains that there was an insufficient chain of custody for items undergoing DNA analysis, serology examination, and other testing. Wilson complains about the DNA testing conducted by Cindy Brown on blood found on a shoe, the steering wheel of Wilson's vehicle, items found on Wilson's porch (including a Quik-Trip jacket, a Nike jacket, a paper sack, a latex glove, and an aluminum baseball bat). Wilson complains about Yorkston's testing of items included above as well as the handcuff. Wilson also complains about Yorkston's testimony regarding a piece of amber glass which presumably matched glass found at the scene.

¶ 50 At no time during Yorkston's or Brown's testimony did Wilson object on the grounds that there was an insufficient chain of custody for the blood analysis. Counsel did object to the admission of items from which blood samples were taken. However, he did not object to the chain of custody of the blood samples after they were taken from these items of evidence. Then at the end of the State's case, pursuant to the trial court's procedure, defense counsel made general objections to the evidence already admitted. The trial court found that there was no substitution or tampering of the evidence, the evidence "was in substantially the same con-

dition at the time it was offered as it was at the time when the crime was committed."

¶ 51 "The purpose of the chain of custody rule is to guard against substitution of or tampering with the evidence between the time it is found and the time it is analyzed." *Middaugh v. State,* 1988 OK CR 295, ¶ 16, 767 P.2d 432, 436. While it is the State's responsibility to show the evidence offered is in substantially the same condition at the time of offering as when the crime was committed, it is not necessary that all possibility of alteration be negated. *Williamson v. State,* 1991 OK CR 63, ¶ 46, 812 P.2d 384, 397–98, *cert. denied,* 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). If there is only speculation that tampering or alteration occurred, "it is proper to admit evidence and let what doubt there may be go to its weight rather than render the evidence completely inadmissible." *Contu v. State,* 1975 OK CR 55, ¶ 13, 533 P.2d 1000, 1003.

¶ 52 We find that the items from which blood samples were taken were properly admitted because witnesses identifying these items testified that they were in the same condition as they were when they were found. However, Wilson did not object to the handling of the blood samples taken from these items at the time evidence was introduced regarding the blood analysis. Although his cross-examination of Yorkston questioned the handling of the blood samples, he still did not object to the evidence of blood analysis based on a lack of a chain of custody. Therefore, Wilson has waived the issue he now presents. Absent an objection, we can review for plain error only. We find that the admission of testimony regarding the testing of samples of bloodstains did not rise to the level of plain error.

¶ 53 Wilson further complains that other evidence was introduced in violation of the Discovery Code, in proposition five. Witness Carol Cox testified that a metal fragment imbedded in the victim's head came from handcuffs found. This evidence was disclosed on January 24 along with the DNA test results. As with the DNA test results, the Discovery Code was followed. Therefore, the trial court did not abuse its discretion in allowing this evidence.

¶ 54 An objection was made to testimony from Officer Makison and Danny Boaz, a QuikTrip supervisor, that they could identify the defendants on the store videotapes and still pictures made from the tapes. The objection was partially based on the fact that there had been no discovery on that issue. The trial court found that the police reports were sufficient to give notice that Makison was going to identify the defendants on the tapes. Furthermore the tapes were provided to the defense through discovery. During the motion hearing of January 30, the trial court ruled that there would be no surprise in having Boaz identifying the defendants on the video as he had prior knowledge who the defendants were through personal contact.

¶ 55 Wilson also complains about testimony regarding his unrecorded statements to Detective Folks which included an admission that he had been planning the offense for two weeks before the homicide. The portions of the transcript Wilson cites are re-direct questions regarding Wilson's knowledge that the plan was to kill the victim. The recorded portion of the tape clearly indicates that Folks was questioning Wilson about whether he knew Yost would be killed. Wilson finally acknowledged that he "knew they were going to do that." During Folks' direct testimony, Wilson never objected to questions regarding the fact that Wilson told him that they planned on killing Yost two weeks prior. Absent any evidence to the contrary, we cannot say that the trial court abused its discretion in allowing the identifications and the testimony regarding Wilson's statements.

¶ 56 Lastly, Wilson complains about testimony from John Johnson regarding the policy and procedure that employees of QuikTrip were to follow if they were robbed. Wilson's attorney objected because it was not part of the discovery. The trial court overruled the objection and allowed the testimony. We cannot determine whether the evidence was or was not provided through discovery. However, this witness was endorsed on the original Information

and the prosecutor, at the January 27 motion hearing, advised the trial court that they had turned over information about endorsed witnesses' testimony. Based on the entire record, we find that, even if this testimony was not included in the discovery information, its introduction was harmless beyond a reasonable doubt.

## V. FIRST STAGE INSTRUCTION ISSUES

¶ 57 In proposition seven, Wilson argues that the trial court erred in refusing to instruct on the lesser included offense of second degree felony murder. Wilson claims that there was evidence supporting the view that the murders occurred during the course of robbery by force and fear, a lesser included offense of robbery with a dangerous weapon. We do not agree.

¶ 58 "Robbery, the predicate felony in second degree felony murder, cannot be accomplished with a dangerous weapon. If it is, the offenses are Robbery with a Dangerous Weapon and first degree felony murder." *Foster v. State*, 1986 OK CR 19, ¶ 31, 714 P.2d 1031, 1039, *cert. denied*, 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173. In this case, the evidence clearly showed that the victim was beaten to death with a baseball bat, a dangerous weapon which was used to complete the robbery. Where there is no evidence to support a lesser included offense the court has no right to ask the jury to consider the issue. *Boyd v. State*, 1992 OK CR 40, ¶ 11, 839 P.2d 1363, 1367–68, *cert. denied*, 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993). There was no evidence other than the evidence that a dangerous weapon was used to commit the robbery. Accordingly, we find no error.

## VI. DOUBLE JEOPARDY

¶ 59 In proposition four, Wilson claims that his conviction for robbery with a dangerous weapon and first degree murder violate the prohibition against double jeopardy. At Wilson's request, the trial court gave a general first degree murder verdict form to the jury. The trial court instructed that they could find Wilson guilty of first degree mur-

der under either of the alternative theories. Based on this record, there is no way of determining whether the jury found Wilson guilty of malice murder or felony murder.

¶ 60 When a defendant is charged with alternative theories of murder and the jury's verdict form does not specify under which theory, malice murder or felony murder, the defendant was found guilty then "the verdict must be interpreted as one of felony-murder in order that appellant receive the benefit of the rule that a defendant cannot be convicted of felony-murder and the underlying felony." *Munson v. State*, 1988 OK CR 124, ¶ 28, 758 P.2d 324, 332, *cert. denied*, 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989).

¶ 61 Because it is impossible to determine under which theory of first degree murder Wilson was convicted, we must order that his conviction for robbery with a dangerous weapon be dismissed.

## VII. SECOND STAGE ISSUES

### A.

¶ 62 Wilson contends that the trial court erred in allowing, during the second stage, the admission of his statements made to police on February 16, 1996. It seems that Wilson was pulled over for speeding by Sgt. Samuel McCullough of the Tulsa Police Department ten days before he was involved in the murder of Yost. During that traffic stop Wilson was asked to step from the car and provide identification. Wilson had no identification so he was asked to sit in the patrol car. While in the patrol car McCullough asked Wilson who he was and asked about his arrest record. Wilson identified himself and said that he had been arrested in a double homicide in October of 1994 and was awaiting sentencing on a lesser charge of accessory to murder. Wilson was asked if he had any guns or drugs in his vehicle and Wilson stated "No, you can look if you want to." During the search of the vehicle, Sgt. McCullough observed a black baseball bat and found a loaded .25 caliber handgun under the passenger seat.

¶ 63 Wilson objected during the testimony of McCullough "for the same reasons stated earlier in our *in-camera* hearing." The discussion during the *in-camera* hearing was that the statements regarding being an accessory after the fact to murder were not relevant to the continuing threat aggravator. Wilson now claims that the statements were inadmissible because no *Miranda*[5] warnings were given and that the consent to search was invalid because the consent was made during the illegal interrogation and arrest.

¶ 64 Whenever a defendant makes a specific objection at trial no different objections will be considered on appeal. *Romano v. State*, 1995 OK CR 74, ¶ 18, 909 P.2d 92, 109, *cert. denied*, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996). By failing to object to the testimony and evidence based on custodial interrogation without giving the *Miranda* warning and a "coerced" consent to search, Wilson has waived all but a review for plain error.

¶ 65 Under the facts presented at trial it is reasonable to conclude that Wilson was not in custody for purposes of *Miranda* and that the consent to search was voluntary. Accordingly we find no plain error in the admission of this evidence.

### B.

¶ 66 In proposition nine, Wilson claims that during the second stage he was the victim of an evidentiary harpoon which came in the form of prejudicial hearsay. Sgt. Huff testified regarding Wilson's previous conviction for accessory after the fact of murder. During his testimony he testified that he was contacting Wilson for another detective because "it was known that he [Wilson] had been driving a vehicle which matched the description as the vehicle used in that homicide the previous night."

¶ 67 Wilson admits, in a footnote, that his attorney failed to object to the answer, and claims that the testimony constitutes plain error because it violated his Sixth Amendment right to confrontation. "Plain error is that error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense." *Cleary v. State*, 1997 OK CR 35, ¶ 81, 942 P.2d 736, 752, *cert. denied*, —— U.S. ——, 118 S.Ct. 1528, 140 L.Ed.2d 679 (1998).

¶ 68 We find that the answer did not rise to the level of plain error. First, Wilson was not harmed by this statement because after being brought in by Huff, Wilson told Sgt. Meek about his involvement in the drive by shooting. Second, the answer was in response to questioning about why Huff was contacting Wilson. The answer was given, not for the truth of the matter asserted, but to explain why he was contacting Wilson.

### C.

¶ 69 In propositions ten and sixteen, Wilson attacks the "especially heinous, atrocious or cruel" aggravating circumstance. Wilson argues that there was insufficient evidence for the "especially heinous, atrocious or cruel" aggravating circumstance in proposition ten. In the first part of this proposition Wilson claims that the evidence was insufficient to show conscious physical suffering. Wilson is correct in claiming that to support the heinous, atrocious or cruel aggravator the State must prove conscious serious physical abuse or torture prior to death. *See Willingham*, 947 P.2d at 1084. This may include the infliction of either great physical anguish or extreme mental cruelty. *Cheney v. State*, 1995 OK CR 72, ¶ 15, 909 P.2d 74, 80. On appeal, the standard of review is "whether there was any competent evidence to support the State's charge that the aggravating circumstance existed ." *Bryson v. State*, 1994 OK CR 32, ¶ 52, 876 P.2d 240, 259, *cert. denied*, 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995).

¶ 70 The medical examiner testified that the first blow by the baseball bat could have rendered Yost unconscious. However, before the baseball bat was ever introduced into the attack, Yost was attacked and dragged into the back room by his four assailants. Yost screamed for help while the bat was being retrieved from the car. Obviously he was being restrained at that time by

---

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Wilson and another defendant. Yost suffered injuries to his hands, arguably coming from the blow from the bat, indicating defensive wounds. There was a piece of metal from the handcuff imbedded in Yost's head indicating that he had his hands between his head and the bat. In the surveillance tape noises can be heard during the attack after the baseball bat was taken to the cooler where Yost was being held. Once the bat arrived, it is possible that Yost was struck and rendered unconscious with one blow. However, we find that before the bat was brought into the attack, Yost had suffered the extreme mental anguish of being held captive, knowing that his ultimate fate rested in the hands of his attackers whom he could identify if left to live.

¶ 71 In *Cheney*, 909 P.2d at 80, we said: [T]his Court has limited this aggravating circumstance to cases in which the State proves beyond a reasonable doubt that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met." As to the extreme mental cruelty prong of this aggravating circumstance, "torture creating extreme mental distress must be the result of intentional acts by the defendant. The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created." (footnotes omitted.)

¶ 72 There is ample evidence of the extreme mental anguish suffered by Yost prior to his death. This evidence illustrates the realization by Yost that he was going to be harmed and even killed by the gang of robbers who had overpowered him and dragged him into a back room. *See Neill v. State*, 1994 OK CR 69, ¶¶ 64–65, 896 P.2d 537, 556, *cert. denied*, 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996).

¶ 73 In the second portion of this proposition, Wilson claims that the especially

heinous, atrocious, or cruel aggravator does not apply to him because he did not inflict the serious physical abuse, nor did he intend that such abuse be inflicted. Wilson citing *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) correctly claims that, in a felony murder prosecution, the State must at least show that the accused substantially participated in the killing.

¶ 74 As we stated before, we will presume that the jury convicted Wilson under the felony murder theory, so that Wilson will be provided the benefit of the prohibition against double jeopardy. We make the same presumption here.

¶ 75 The evidence that Wilson substantially participated in the killing is clear. Wilson was involved in the initial subduing of Yost. He admitted that he knew that Yost would be killed. Wilson even supplied the bat used to beat Yost to death. He was present in the back room when the bat was brought in by Harjo. He was present when sounds of the first blow can be heard on the audio/videotape. He had to know that a beating with a baseball bat would cause serious conscious physical suffering and death. *See Hatch v. State*, 1985 OK CR 57, ¶ 6, 701 P.2d 1039, 1040 (Death penalty upheld where "[d]efendant ... contemplated that a killing was not only possible, but probable and further that lethal force [would] probably be employed.")

¶ 76 In proposition sixteen Wilson claims that the especially heinous, atrocious or cruel aggravator does not perform the constitutionally required narrowing process. The "heinous, atrocious or cruel" aggravator has been analyzed thoroughly and, when properly limited by the conditions precedent of torture or serious physical abuse, is consistent with the mandates of the Eighth and Fourteenth Amendments. *Toles v. State*, 1997 OK CR 45, ¶ 59, 947 P.2d 180, 192, *cert. denied*, —— U.S. ——, 118 S.Ct. 2380, 141 L.Ed.2d 746 (1998). We decline the invitation to deviate from our previous holdings.

**D.**

¶ 77 In propositions seventeen and eighteen, Wilson attacks the "continuing

threat" aggravating circumstance. Wilson claims that evidence regarding his conviction for accessory after the fact of murder was irrelevant to the aggravating circumstance of continuing threat in proposition seventeen. To show continuing threat the State must show the existence of a probability that the defendant would commit acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(7).

> To prove "continuing threat" the State must show a particular defendant has a pattern of criminal conduct that will likely continue in the future. Any relevant evidence showing the probability that the defendant will commit future acts of violence including unadjudicated criminal conduct is admissible.

*Douglas v. State,* 1997 OK CR 79, ¶ 86, 951 P.2d 651, 676, *cert. denied,* —— U.S. ——, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998) (citations omitted). We find the evidence that Wilson pled guilty to accessory after the fact to the crime of murder was relevant to show that he would pose a continuing threat to society. The basis for his conviction was that he held the gun used in a drive by shooting for a person; however, the facts revealed that he may have been more involved in this drive-by shooting by providing ammunition for the gun on the day of the murder. There is no error here.

¶ 78 In proposition eighteen, Wilson claims that the continuing threat aggravator did not serve the necessary narrowing function. We have previously held that the "continuing threat" aggravator is neither vague nor overbroad. *Toles,* 947 P.2d at 192. We decline to reconsider our previous decision in this regard.

¶ 79 Wilson next claims that the Uniform Instruction is improper and leaves the meaning of the aggravator hopelessly vague. First we note that counsel did not object to this instruction. Therefore he has waived all but plain error. We find that the Uniform Instruction on the continuing threat aggravating circumstance tracks the language of the statute as well as language found in our case law. *Malone v. State,* 1993 OK CR 43, ¶ 38,

876 P.2d 707, 716; 21 O.S.1991, § 701.12(7). Because the instruction is based on the language of the statute as well as on our case law, there is no error in the instruction. It correctly performs the narrowing processes necessary to be constitutionally acceptable.

### E.

¶ 80 Wilson claims in proposition nineteen that the instructions on the issue of mitigation allowed the jury to disregard mitigating evidence. The language of the standard instructions has been considered thoroughly by this Court, and we find it properly instructs the jury on the use of mitigating evidence. *Toles,* 947 P.2d at 193. The standard OUJI–CR 2d instructions on aggravators and mitigating evidence were given in this case. Accordingly we find no error here.

### F.

¶ 81 In proposition fourteen, Wilson asserts that his death sentence must be vacated because the jury was exposed to inadmissible victim impact evidence. In this case, two members of the victim's family read prepared statements which had previously been approved by the trial court. Wilson's attorney did not make a contemporaneous objection to the testimony of the victims. Because Wilson did not make a contemporaneous objection to the victim impact evidence, we can review for plain error only. *Cleary,* 942 P.2d at 752.

> This Court has stated that both "victim impact statements" and "victim impact evidence" are admissible in a capital sentencing procedure. This includes a victim's rendition of the "circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." However, "evidence may be introduced 'that is so unduly prejudicial that it renders the trial fundamentally unfair,' thus implicating the Due Process Clause of the Fourteenth Amendment."

*Willingham,* 947 P.2d at 1086 (footnotes and citations omitted).[6]

---

**6.** While I recognize that a majority of this Court has held that both "victim impact evidence" un-

Our statutory language is clear, the evidence in a victim impact statement is to be limited to the "financial, emotional, psychological, and physical effects," or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim.

*Conover v. State,* 1997 OK CR 6, ¶ 61, 933 P.2d 904, 920.

 ¶ 82 In this case, Wilson complains about statements from the victim's wife stating she enjoyed cooking and ironing for the victim. This evidence is relevant to show the psychological, emotional and physical impact of the victim's death. Wilson complains about the victim's mother's statements that he had just received his real estate license and had plans for the future. The victim's mother also stated that the victim told her that he would take care of her in her old age and for her not to worry about the future. These statements were relevant to show the financial and emotional impact of the crime itself on the victim's survivors. Wilson claims that the mother's statement was hearsay. Arguably the statement was not offered for the truth of the matter asserted, thus not hearsay. The statement was only offered to show that the victim's mother believed that the victim would take care of her financially in the future.

 ¶ 83 The victim's wife testified that the victim was especially fond of Christmas holidays because he was raised in a family that did not celebrate Christmas. The victim's mother testified that she didn't have any problems with the victim as a child. Statements about a victim's childhood have no relevance in victim impact evidence. *See Cargle v. State,* 1995 OK CR ——, ¶ ——, 909 P.2d 806, 829 (pointing out victim's positive attributes as a child "in no way provides insight into the contemporaneous and prospective circumstances surrounding his

der 21 O.S.Supp.1997, § 701.10(C) and "victim impact statements" under 22 O.S.Supp.1997, §§ 984 and 984.1 are admissible before a jury in a capital sentencing procedure, I continue to be of the opinion that only "victim impact evidence," defined in section 701.10(C) as evidence about the victim and the impact of the murder on the family of the victim, is admissible before a jury in a capital sentencing proceeding.

death"). We find that these comments amounted to error, but they do not rise to the level of plain error, because they did not go to the foundation of the case, or take from Wilson a right essential to his defense. *See Willingham,* 947 P.2d at 1088.

 ¶ 84 Wilson finally complains that the victim impact evidence in this case served as nothing more than a "superaggravator." We have previously held that victim impact evidence is very different and serves a different purpose than aggravation evidence. *Willingham,* 947 P.2d at 1086. The State is still required to prove at least one aggravator beyond a reasonable doubt before the death penalty may be imposed. *Id.*

¶ 85 In this case, the jury was specifically instructed that they could only consider the aggravating circumstances set forth in the instructions. Wilson has not convinced us that the jury would not have found the aggravating circumstance but for the victim impact evidence. *Id.*

## VIII. ISSUES ADDRESSING BOTH FIRST AND SECOND STAGE.

¶ 86 In proposition eleven, Wilson argues that the introduction of highly prejudicial, cumulative and irrelevant evidence deprived him of a fair trial and sentencing procedure. Relevant evidence is that which has any tendency to make more or less probable a material fact in issue. 12 O.S.1991 § 2401. "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence or unfair and harmful surprise." 12 O.S.1991, § 2403.

 ¶ 87 Wilson first claims that gruesome photographs introduced during the first stage of trial deprived him of a fair trial.

It is my opinion that "victim impact statements," defined in § 984, and provided for in § 984.1, including circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence, should only be presented to the trial judge at the formal sentencing proceeding. I also believe that the language of the legislature supports my position on this issue.

These pictures, State's exhibits 19, 20 and 113, depicted the wounds to the victim and the crime scene. The photographs also aided the medical examiner in his explanation of the wounds to the victim and manner of death. Thus, they were relevant to show the cause of death and the intent of the attacker. The fact that they were gruesome does not make them inadmissible. Their probative must be substantially outweighed by the danger of unfair prejudice. *Willingham*, 947 P.2d at 1083. Gruesome photographs are a result of gruesome crimes. *McCormick v. State*, 1993 OK CR 6, ¶ 10, 845 P.2d 896, 898. That is what we have here. We find no abuse of discretion in the admission of these photographs.

■ ¶ 88 Wilson next claims that certain photographs introduced during the first and second stage were cumulative. The probative value must be substantially outweighed by the needless presentation of cumulative evidence. 12 O.S.1991, § 2403. Wilson claims that still pictures taken from the store surveillance video were cumulative of the video. The store surveillance video showed the events as they transpired. The still photographs taken from this video made it easier for witnesses to identify the defendants at the time certain events are taking place. Therefore, they were introduced for different purposes and are not cumulative.

■ ¶ 89 He claims that the diagrams and photographs of the scene were also cumulative of the crime scene video introduced during the second stage. The diagrams and the photographs of the scene were introduced to give the jury an idea of the layout of the store and different angles of the crime scene. The crime scene video gives the jury a walk through perspective of the crime scene.[7] This information was relevant to prove the aggravating circumstances alleged by the State: that the murder was especially heinous, atrocious or cruel and that Wilson would commit future acts of violence which would constitute a continuing threat to society. The introduction of these separately did not result in the needless admission of cumulative evidence.

¶ 90 Wilson claims that the introduction of the money taken from the codefendants was not relevant. The State had the burden of proving that the defendants acted conjointly in the robbery. Evidence obtained from the codefendants was relevant to show that they were acting together in the robbery.

¶ 91 Wilson complains that photographs introduced during the second stage of trial were too prejudicial, and repetitious pictures of injuries to the victim's hands were unnecessary. The injuries to the hands were necessary to show that the victim was trying to defend himself thus was conscious during the attack. Therefore these photographs were probative. We find that the probative value was not substantially outweighed by the danger of unfair prejudice.

■ ¶ 92 Wilson also complains about the post-autopsy photograph of the interior of the skull showing a hinge type fracture at the base of the skull (State's exhibit 115). We assume that this photograph was introduced to show the sheer force of the blows to the victim's head. However, we fail to find the relevance of this photograph for second stage. Post-autopsy photographs generally are found to be inadmissible, for any probative value they have is substantially outweighed by prejudicial effect. 12 O.S.1991, § 2403. The relevance of this photograph is negligible because it shows the handiwork of the medical examiner rather than the defendant or his codefendants. Its prejudicial value is great because it tends to shock the general public unaccustomed to viewing the inside of the human body. *Sattayarak v. State*, 1994 OK CR 64, ¶ 8, 887 P.2d 1326, 1330; *Oxendine v. State*, 1958 OK CR 104, ¶¶ 6–8, 335 P.2d 940, 943.

¶ 93 This Court will not disturb a trial court's decision to admit evidence absent an abuse of discretion; however, an abuse of discretion will be found where the probative

---

7. The video in this case does contain a narrative describing the scene; however, the volume was turned off when shown to the jury. Therefore, the video is not prejudicial like the one I found

offensive in *Duckett v. State*, 1995 OK CR 61, ¶¶ 1–3, 919 P.2d 7, 27–28 (Lane, J. concurring in result).

value of a photograph is substantially out-weighed by the danger of unfair prejudice. *Spencer v. State*, 1990 OK CR 49, ¶ 8, 795 P.2d 1075, 1078. Here the probative value is outweighed by the danger of unfair prejudice, and the trial court erred by admitting the photograph.

¶ 94 Though we find error in the admission of a photograph, such error does not always require reversal. *Darks v. State*, 1998 OK CR 15, ¶ 44, 954 P.2d 152, 164. To determine the prejudice incurred by the erroneous admission, we look to the nature of the other photographic evidence admitted at trial. In this case, photographs of the numerous wounds to the victim's head suffered by the victim were properly admitted. These photographs were far more prejudicial than the sterile, clinical photograph of the inside of the victim's skull. And while the photograph of the interior of the skull was more prejudicial than probative, given the other, properly admitted photographs, we do not find that the jury imposed the death penalty because of its introduction. This error is harmless.

¶ 95 Wilson complains that the introduction of photographs of two Sprite cartons (State's exhibit 124) was cumulative to a photograph of the victim's body in relation to soft drink containers (State's exhibit 18). State's exhibit 124 is a close-up of blood splatters found on boxes on the shelves a few feet above the victim; exhibit 18 shows the relationship between these boxes and the victim's body. These photographs were relevant to show that the victim may have been standing or kneeling when he was struck. They show different angles and are not cumulative. They are relevant to show that he was conscious during the attack.

¶ 96 Wilson complains about two firearms introduced during second stage. One of the pistols was recovered from Wilson during the investigation of a drive-by shooting for which Wilson pled guilty to accessory after the fact to first degree murder. Wilson actually had the loaded pistol concealed under his shirt and tried to conceal it under some sheets on his bed in the presence of police detectives. The other loaded pistol was recovered from Wilson's vehicle during the traffic stop of February 16, 1995. Wilson was driving and Brown was in the passenger seat. The firearm was found under the passenger seat. According to the arresting officer, Wilson was charged with transporting a firearm as a result of this stop. The State introduced this evidence to prove the continuing threat aggravator. We find no error in the introduction of these pistols.

## IX. PROSECUTORIAL MISCONDUCT

¶ 97 Wilson claims in proposition twelve that improper tactics and arguments of the prosecutor deprived him of a fair trial. Wilson first claims that the prosecutor argued facts not in evidence during the first stage closing argument. He admits that there was no objection to these comments; therefore, he has waived all but a review for plain error. The first comment Wilson complains about is the prosecutor's comment that rolls of money were found after Wilson's car, a '91 Ford Escort, was stopped. The vehicle stopped, a gray Chevrolet, was not Wilson's vehicle. It was a vehicle in which Wilson was a passenger. Rolls of money were found in the pockets of three of the occupants in the vehicle. In reviewing this misstatement of the facts in light of the totality of the evidence, we determine that this misstatement of fact by the prosecutor does not rise to the level of plain error. *Bear v. State*, 1988 OK CR 181, ¶ 29, 762 P.2d 950, 957.

¶ 98 Next, Wilson complains that the prosecutor quoted him as saying "yeah, we were going to kill him" and that they decided to kill him two weeks before. Wilson's recorded statement is not that clear of an admission. However, Folks testified that Wilson admitted to talking about robbing the QuikTrip some two weeks prior and that Wilson said that "we planned on killing him." On cross-examination, Folks said that this probably occurred during an unrecorded conversation, because it was not on the tape recorded interview. The statements of the prosecutor regarding this testimony was an accurate review of Folks' testimony; therefore, there was no error here.

¶ 99 Wilson claims that the prosecutor unnecessarily ridiculed him by first calling him a psychopath during the second stage arguments. A psychopathic personality is defined as "an emotionally and behaviorally disordered state characterized by clear perception of reality except for the individual's social and moral obligations and often by the pursuit of immediate personal gratification in criminal acts, drug addiction or sexual perversion." *Webster's Collegiate Dictionary* 10th ed. p 943 (1997). Dr. Reynolds, the defendant's mental health witness, testified that Wilson had some characteristics of a psychopath, but he did not believe that Wilson was a psychopath. The prosecutor also referred to Wilson as being no better than an animal that you put down to sleep, when they act this way. He said that Wilson was unadulterated evil and a psychopathic killer. The State should refrain from unwarranted personal criticism or name calling. *Le,* 947 P.2d at 555. However, based on the entire record before us, we find that these comments did not rise to the level of plain error.

¶ 100 Wilson complains that the prosecutor cast aspersions upon defense counsel during voir dire by asking the jurors, "You won't let a smoke screen fool you?" Defense counsel objected and asked for a mistrial. The trial court admonished the jury to disregard the remark. Wilson claims that the admonishment was not sufficient to cure the error. The prosecutor was merely asking the jury to use common sense to evaluate evidence and not be fooled by irrelevant information. These comments were not attacks on defense counsel. Thus no error occurred.

¶ 101 Next, Wilson complains that the prosecutor went too far in his attempts to invoke sympathy for the victim and the victim's family during the second stage argument. No objections were made to the prosecutor's comments during the second stage closing argument. The prosecutor first stated,

> You put yourselves in the victim's shoes. Each and every day you get up, you put on your clothes, and you go to work. You tie your shoes, you get off—you get off to work, you kiss your wife and your kids, if you have any, good bye. And you don't know what the day might bring. You only have hope. And he left that particular night, on the 25th, hoping it to be just like an ordinary day in terms of what he would do.

> He didn't have the chance to tell Angela goodbye. He didn't have the chance to tell his two sons goodbye. And when he was preparing for work, I anticipate he wasn't pondering how he was going to die. He had no—he had no opportunity to prepare himself to die. He had 2 minutes and 11 seconds.

The prosecutor later expressed his feigned sorrow that Wilson's mother had to wait 20 minutes to see Wilson in jail and then asked the jury, "Ms. Dorn (Yost's mother) right over there, guess how long she gets to wait to see her son because of his actions, because of his plotting? The rest of her life, she gets to wait to see Richard." The prosecutor then referred to defense counsel's closing as begging for mercy then stated that Richard Yost begged for mercy, but they sentenced him to death. "He (Wilson) wants you to do something less for him. Why?" Then the prosecutor stated that there are no good reasons based on what Wilson did to Yost to give less than death.

¶ 102 Wilson claims these arguments in closing reinforced and revived the prosecutor's comments made during voir dire that one of the purposes for punishment was to restore the "equilibrium that has been upset by the murder of an innocent person." Wilson claims that these arguments were intended to cause the jury to disregard the mitigating evidence and show no mercy because he had shown no mercy to Yost.

> The State should not encourage the jury to impose the death penalty out of sympathy for the victims. This Court has specifically condemned many of the comments made in second stage, stating "[t]here is no reason for them and counsel knows better and does not need to go so far in the future." ... No amount of mitigating evidence can counter this argument, and if the jury agrees they may not even consider mitigating evidence.

*Le,* 947 P.2d at 554–55. However, Wilson has not shown that the jury improperly weighed the mitigating evidence in his case. While the prosecution arguments were clearly error, they do not rise to the level of plain error.

¶ 103 Wilson next argues that the prosecutor told the jury that they had a duty to convict. During the first stage closing, the prosecutor called the process (the jury trial) the "great equalizer ." The prosecutor stated that "what was so unfair that night is now equalized." What was "four plus a bat versus one" is now "one versus the justice 12 of you can deliver in your verdict of guilty to murder." Objections were overruled by the trial court. These comments are tantamount to telling the jury that their job was to avenge the murder of Yost. The jury's duty is to determine the facts from the evidence, to follow the law, and to reach a verdict based upon the evidence, as they are so aptly instructed by the trial court. The jury's duty is not to render a verdict out of a sense of vengeance or as "the great equalizer." To ask them to do so is error. However, in this case, based on the overwhelming evidence of guilt, we find the comments to be harmless. "This Court will not reverse a conviction for prosecutorial misconduct unless the State's argument is so flagrant and of such a nature as to be prejudicial to the defendant." *Hammon,* 1995 OK CR 33, ¶ 91, 898 P.2d 1287, 1307.

¶ 104 Wilson also claims that this first stage argument influenced the jury during the second stage and caused them to render the sentence of death out of a sense of duty to equalize matters. Again, Wilson has not shown that the jury improperly weighed the evidence in second stage; therefore, Wilson was not prejudiced during second stage.

¶ 105 Wilson argues that the prosecutor misstated the law during voir dire by informing the jury that they will be "recommending a sentence." Objections by defense counsel were overruled. We have held that this type of comment is not error. *Humphreys v. State,* 1997 OK CR 59, ¶ 5, 947 P.2d 565, 570, *cert. denied,* —— U.S. ——, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). Next, Wilson claims the prosecutor misstated the

law during voir dire by trying to define parties to crimes as a person who is present during the commission of a crime or someone who stood by and watched. Also, regarding punishment, the prosecutor asked whether the fact that the person did not actually strike the fatal blow makes him less liable to receive the death penalty. In second stage closing, the prosecutor told the jury that under their oath, they had to reach a decision. Of these comments only two were met with a contemporaneous objection which was sustained; this cured the error. *Smith v. State,* 1996 OK CR 50, ¶ 29, 932 P.2d 521, 531–32. We find that the other comments did not rise to the level of plain error.

¶ 106 Lastly, Wilson claims that the lack of an objection to the remarks complained of does not constitute waiver of the prejudice caused by the combined effect of the erroneous comments. While we are confounded by the fact that experienced prosecutors jeopardize cases, in which the evidence is overwhelming, with questionable argument, we have reviewed the prosecutor's conduct and comments in their entirety and in comparison to the great weight of evidence presented, both during first and second stage, we find his conduct and comments did not contribute to the verdict and sentence of death. *Jones v. State,* 1995 OK CR 34, ¶ 90, 899 P.2d 635, 654–55, *cert. denied,* 517 U.S. 1122, 116 S.Ct. 1357, 134 L.Ed.2d 524 (1996).

## X. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

¶ 107 In proposition fifteen, Wilson asserts that he was denied effective assistance of counsel for several reasons. To successfully prove ineffective assistance of counsel, Appellant must show that defense counsel's performance was deficient and that he was prejudiced by the deficient performance. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993).

¶ 108 Wilson first asserts that his attorney failed to fully investigate his mental health background or effectively assist Dr. Reynolds in preparation for his second stage

testimony. Wilson has filed, contemporaneously with this issue, an application for an evidentiary hearing regarding ineffective assistance of counsel in an attempt to supplement the record with material not found in the record.

¶ 109 A review of the trial record shows trial counsel did put forth a mental health expert to rebut the State's continuing threat contention and to mitigate punishment. At trial, Dr. Reynolds testified that he examined Wilson on three separate occasions. He also met with Wilson's mother and was provided with Wilson's medical records, school records and statements from people who knew Wilson. Reynolds testified that Wilson had a severe personality disturbance. Reynolds explained that Wilson had some unusual, bizarre types of thinking that would suggest that he is not in touch with reality at times. Reynolds testimony indicated that Wilson committed this crime as an intelligent but immature person, and that, because of his family support and his intelligence, he had the capability of being rehabilitated. The mere fact more evidence could have been presented is not, in itself, sufficient to show counsel was deficient. *Douglas*, 951 P.2d at 680. Reynold's testimony was credible and well developed. We find Appellant has failed to carry his burden to show either deficient performance by counsel, or prejudice from the omission of this specific evidence.[8]

¶ 110 Wilson next claims that counsel was ineffective for failing to properly preserve the record for appellate review by making timely objections. First, Wilson claims that trial counsel was ineffective for failing to request a hearing on the scientific reliability of the DNA evidence, which is raised as a substantive proposition of error in proposition three. We find that counsel's failure to request the hearing did not alter the outcome of this trial, nor did it render the result of this proceeding fundamentally unfair or unreliable. *Lockhart*, 506 U.S. at 369, 113 S.Ct. at 842. As stated previously, the PCR DNA method has been accepted by

this Court. Therefore, Wilson cannot show that he was prejudiced by this omission.

¶ 111 Wilson claims that trial counsel was ineffective for failing to specifically object to the introduction, during second stage, of Wilson's statements made on February 16, 1995, on the grounds that Wilson was not advised of his *Miranda* rights. We previously held, when discussing Wilson's proposition eight, that the facts indicate that Wilson was not in custody; therefore, *Miranda* did not apply. Wilson cannot show that he was prejudiced by the failure to object based on the failure to give the *Miranda* warning.

¶ 112 Wilson claims that trial counsel was ineffective for failing to object to the second stage comments of Sgt. Huff, which he complained about in proposition nine. We held that the introduction of the statement did not harm Wilson; therefore, Wilson cannot show that he was prejudiced by the comment.

¶ 113 Finally, Wilson claims that his attorney was deficient by failing to object to comments made by the prosecutor during first stage closing argument, voir dire and second stage closing argument. We discussed these comments in proposition twelve. We find that the comments did not affect the outcome of this trial or render the trial fundamentally unfair or unreliable; therefore, Wilson can show no prejudice from the failure of counsel to object to the prosecutor's comments.

## XI. CUMULATIVE ERROR.

¶ 114 Wilson, in proposition twenty, asks us to look to the combined effect of the errors if we determine that none of the errors singly requires reversal. We have found that during first stage there were no errors which considered singly required reversal. In viewing the effect of these errors cumulatively, we find that they do not require reversal. During second stage, we found error in the introduction of State's exhibit 124 (the photograph of the interior of the skull). We also found some error, al-

---

8. Accordingly, we further find that Wilson's application for an evidentiary hearing on this claim should be denied.

though not plain error, in the victim impact statements and the prosecutors comments. In viewing the cumulative effect of these errors we find they do not require reversal of this case. *Gilbert v. State*, 1997 OK CR 71, ¶ 101, 951 P.2d 98, 122, *cert. denied,* —— U.S. ——, 119 S.Ct. 207, 142 L.Ed.2d 170 (1998).

## XII. MANDATORY SENTENCE REVIEW

■ ¶ 115 Pursuant to 21 O.S.1991, § 701.13(C), we must determine whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor and whether the evidence supports the jury's finding of the aggravating circumstance. The jury found that there existed the probability that Wilson would commit criminal acts of violence that would constitute a continuing threat to society, that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, and that the murder was especially heinous atrocious or cruel. 21 O.S. 1991, § 701.12(4), (5) & (7). We have found that these aggravating circumstances were supported by sufficient evidence.

¶ 116 The mitigating evidence was summarized into an instruction for the jury to consider. This evidence included his young age; his positive behavior at home, school and church; his above average intelligence; his treatable psychological disorder; his traumatic childhood; his beneficial loving and nurturing mother; and those who believe he could be helpful and supportive to others if allowed to live. The jury was instructed that they could determine other mitigating circumstances based on the facts of the case. After reviewing the record and carefully weighing the aggravating circumstances and the mitigating evidence, we find the jury's determination that the aggravating circumstances outweigh the mitigating circumstances is amply supported by the record.

¶ 117 We have found that Wilson's conviction for robbery with a dangerous weapon must be **REVERSED** and **REMANDED** with instructions to **DISMISS.** We find no error warranting reversal of the conviction or sentence of death for first degree murder; therefore, Judgment and Sentence for the crime of murder in the first degree in the District Court of Tulsa County is **AFFIRMED.**

CHAPEL, P.J., and STRUBHAR, V.P.J., concur.

LUMPKIN, J., concurs in results.

JOHNSON, J., specially concurs.

LUMPKIN, J., concurs in results.

¶ 1 I concur in the result reached in this case. I do not agree with portions of the rationale, however, and therefore I write separately to address those points of disagreement.

¶ 2 First, I do not agree that the doctrine of collateral estoppel "prevents Wilson from raising the issue of whether the dual jury procedure is authorized in Oklahoma." To find Appellant bound by the doctrine of collateral estoppel, he would have to be found a "privie" of his co-defendants. Such is not the case. Appellant did not file a Petition for Extraordinary Relief as did his co-defendants. The application of procedural bar in the context of criminal procedure is not necessarily the same as in civil procedure. Here, we should simply be speaking in terms of Appellant's failure to raise this issue below, thereby waiving the claim on appeal. Otherwise, we should simply reiterate the position we took in denying the Petitions for Extraordinary Relief filed by Appellant's co-defendants.

¶ 3 Second, while I am of the opinion Oklahoma law does not prevent the trial court, in the exercise of its discretion, from impaneling dual juries, I remain skeptical regarding the value of this procedure, especially in capital cases. Although I do not find reversible error occurred in the instant case, some of the issues raised by Appellant are illustrative of future problems we will likely encounter when dual juries are impaneled. Rather than broadly endorsing the dual jury procedure, as did the majority in *Cohee v. State,* 942 P.2d 211, 213 (Okl.Cr.1997) (Lumpkin, J. Concurring in part, dissenting in part), I will continue to monitor its impact on the trial on a case-by-case basis.

¶4 Third, with respect to proposition eleven, I believe the opinion goes too far in its discussion of post-autopsy photographs. While I agree with the general principal that post-autopsy photographs should be viewed with a certain degree of suspicion because of their potential to be more prejudicial than probative, we must recognize that post-autopsy photographs may have their place in certain cases. *See Mitchell v. State,* 884 P.2d 1186, 1196 (Okl.Cr.1994) (post-autopsy photograph more probative than prejudicial). In addition, the post-autopsy photograph of the interior of the skull which revealed the hinge type fracture at the base of the skull did not show "the handiwork of the medical examiner". It showed the level of force used by Appellant and his co-defendants as they beat the victim to death. If this injury had been visible on the outside of the victim's body, a photograph of those injuries would have been admissible regardless of how prejudicial it might have been. As the Court recognizes "photographs of the numerous wounds to the victim's head suffered by the victim were properly admitted. These photographs were far more prejudicial than the sterile, clinical photograph of the inside of the victim's skull". Opinion at Pg. 468. I find the photograph was admissible and no error occurred.

¶5 Finally, I cannot concur with the totality of the language and analysis used in the opinion in resolving proposition twelve.

JOHNSON, J., specially concurs.

¶1 I concur and agree with the majority that collateral estoppel applies in this case as to the question of dual juries. Even though Appellant was not a party to the "Extraordinary Writ," the doctrine of collateral estoppel would apply and therefore any additional discussion, I feel, is unnecessary. *Harjo et al. v. Turnbull,* Order (Okl.Cr. January 14, 1997). I agree with the Court's analysis on the balance of the proposition of error (dual jury issues) but feel that the analysis is unnecessary.

¶2 The Court in its discussion on the DNA test results and other places in the opinion indicates that trial counsel failed to object to statements or admission of evidence and therefore the court could only examine for "plain error." This, of course, is a proper statement with which I agree but I need to point out that "plain error" is not one and the same as "reversible error." *Simpson v. State,* 876 P.2d 690, (Okl.Cr.1994). This Court has found that the terms "plain error," "fundamental error," and "substantial right" are one and the same meaning. *Simpson,* 876 P.2d at 695. The errors complained of do not go to the foundation of the case nor show prejudice. The Court was proper in applying the harmless error analysis. *Simpson,* 876 P.2d at 695.

¶3 Guilt in this case is exceedingly clear. This is a horrible case of an unjustified killing. Clearly all of the parties knew what was going to happen because they could all be easily identified and they had to cover their crime with the atrocious murder. I find nothing in this case that would make me change the jury's verdict. Therefore, I specially concur.